UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JING WANG and WAI-LEUNG CHAN,           :
                                         :
                  *Plaintiffs*,            :   Civ. Action No. 1:20-cv-04218
                                         :
        - against -                   :
                                         :
TESLA, INC.,                             :
                                         :
                  *Defendants*.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  :
-                                        x

## COMPLAINT

Plaintiffs Wai-Leung Chan and Jing Wang, by and through undersigned counsel, bring this action against Tesla, Inc., as a result of a car accident caused by Tesla's defective Autopilot system.

## PARTIES

1.     Plaintiffs Wai-Leung Chan and Jing Wang are individuals who reside in Little Neck, NY 11362.

2.     Defendant, Tesla, Inc., f/k/a Tesla Motors, is a corporation organized under the laws of the state of Delaware and having its principal place of business in Palo Alto, California.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332 based on the diversity of citizenship. In this case, the Plaintiffs are citizens of the State of New York, and the Defendant is a corporation based in the State of California.

## FACTS

*The Car*

4.     The Model X is an all-electric sport utility vehicle designed, manufactured, and sold by Tesla.

5.     Tesla publicly touts the Model X as "the **safest**, quickest, and most capable sport utility vehicle in history."[1] In fact, Tesla proclaims the Model X to be "the safest SUV ever."[2]

6.     The Model X is equipped with Tesla's Autopilot[3] feature, which enables the car to steer, accelerate and brake automatically within its lane. More specifically, Autopilot has an "Autosteer" feature, which gives the Model X assisted steering, with cruise control that matches speed to traffic, as well as a Traffic-Aware Cruise Control feature that allows the Model X to accelerate and decelerate to maintain a preset following distance behind the nearest vehicle. Moreover, Autopilot has a Lane Change feature which allows the Model X to automatically change lanes while driving on the highway. Autopilot uses cameras, ultrasonic sensors, and radar to "[d]etect nearby cars, prevent potential collisions and assist with parking."[4]

7.     According to Tesla, the Model X's Autopilot technology provides a stress-free driving experience—with advanced safety and convenience features designed to assist you with the burdensome parts of driving. Tesla claims that Autopilot continuously monitors the Model X's

---

[1] TESLA MOTORS, Model X, last visited Mar. 26, 2020, https://www.tesla.com/modelx/drive (emphasis supplied).

[2] *Id.*

[3] As described by the National Transportation Safety Board ("NTSB"), Autopilot is Tesla's advanced driver assistance systems ("ADAS") that control vehicle speed and lane positioning by automating braking, steering, and torque to the drive motors. The major subsystems associated with the operation of Autopilot are Traffic-Aware Cruise Control (TACC) and Autosteer. TACC is an adaptive cruise control system that provides longitudinal control (acceleration and deceleration) and Autosteer is a lane-keeping assist system that provides lateral control (steering) of the vehicle inside the lane. NATIONAL TRANSPORTATION SAFETY BOARD (NTSB), Accident Report NTSB/HAR-20/01 PB2020-100112, "Collision Between a Sport Utility Vehicle Operating With Partial Driving Automation and a Crash Attenuator." Mountain View, California. March 23, 2018.

[4] TESLA MOTORS, Model S Owner's Manual. About Driver Assistance, at page 65.

surroundings and autonomously changes the vehicle's speed and direction to maintain safe distances from surrounding objects.[5] In fact, Tesla's CEO, Elon Musk, declared that Autopilot was "probably better than humans at this point in highway driving."[6]

8. Autopilot is designed, manufactured, and marketed to assume certain operational and decision-making tasks normally required of the operator of the vehicle – "the burdensome parts of driving,"[7] as acknowledged by Tesla. For example, Tesla markets its automobiles with Autopilot to be used in dense traffic situations on highways with multiple lanes. However, Tesla does not disclose that in those circumstances, like freeway driving in dense traffic, Autopilot sometimes does not work, because at times, Autopilot simply does not recognize other cars and roadway hazards.

9. In fact, even in less complicated driving situations, Autopilot fails to recognize and warn drivers of traffic patterns that involve merging, such as where lane changes take place, traffic exits and enters the highway, and traffic merges as lanes consolidate. Simply put, Autopilot malfunctions for a variety of reasons, including the intermittent failure to recognize a roadway hazard, a roadway interpretation, or a novel traffic pattern. Sometimes, Autopilot just malfunctions without warning.

10. Nonetheless, Tesla fails to adequately disclose in its promotional material, and to its customers and regulators, that Autopilot struggles in certain circumstances to safely identify and respond to certain situations where vehicles and other objects commonly found in highway driving are undetected and present safety risks.

---

[5] TESLA MOTORS, Model X Owner's Manual. About Driver Assistance, at page 65.
[6] Quote of Elon Musk as reported in The Washington Post, January 11, 2016
[7] TESLA MOTORS, Autopilot, last visited Mar. 26, 2020, https://www.tesla.com/autopilot.

3

11. Upon information and belief, Tesla intentionally builds its vehicles and programs its software to ignore slow moving and stationary objects.

12. Upon information and belief, Tesla pushed its Autopilot into commerce with full knowledge of these defects in order to keep its fleet of vehicles operating on the roadway, enabling its fleet of Teslas to capture very valuable data from as many roadway miles as possible to tune its machine learning programs as quickly as possible. In essence, Tesla is using its customers, without their knowledge or consent, to test its Autopilot software, thereby providing Tesla with critical information to improve its products at the risk to consumers and other members of the public.

13. Tesla tries to distance itself from potential liabilities by initially referring to the Model X operating software as being in a "beta-testing phase." After Germany's Federal Office for Motor Vehicles refused to approve Autopilot for use on German roads, Tesla explained that the word "beta" is not used in the standard sense of the word but was used to make sure Tesla drivers do not get too comfortable with its autopilot system.[8]

14. Rather than providing transparent disclosures, Tesla tells its customers and regulators that when Autopilot fails, the driver is the fallback option to resume control of the vehicle.[9] This fallback plan is unreliable and unsafe. Not only has Tesla been warned by the NTSB

---

[8] Fred Lambert, "European Authority says 'no safety concerns' with Tesla's Autopilot after 'beta' scare" Electrek, July 14, 2016, https://electrek.co/2016/07/14/european-authority-tesla-autopilot-after-beta-scare/.
[9] Tesla instructs its drivers to maintain their hands on the wheel and apply a significant level of resistance to assure the vehicle's system that the driver is properly engaged. Steering wheel torque, which is a fundamental premise for Tesla to measure engagement by the driver, and an essential element of Tesla's safety paradigm, is not a proper way to control for distraction and ensure driver engagement. U.S. Department of Transportation, National Highway Traffic Safety Administration, DOT HS 812 182, "Human Factors Evaluation of Level 2 and Level 3 Automated Driving Concepts," at page 1. August 2015.

that drivers of their automobiles may become overly reliant on the Autopilot technology,[10] but Tesla also knows or should know, based on scientific and engineering publications, that drivers have a limited ability to execute a "take over response" when Autopilot does not measure up. Indeed, the "takeover response" time for humans varies greatly depending on the circumstances: the type of stimuli, the type of control necessary, and the driving situation. Even the most attentive drivers need a certain amount of time to perform a takeover response. The malfunctioning and defective Autopilot system does not allow for that margin of time, nor does it provide a sufficient warning to enable the driver to properly respond.  In other words, Tesla knows that reasonable drivers will not, and more significantly, perhaps cannot safely use Autopilot.[11]

15. Instead, by counseling its customers that they must be ready to assume control, Tesla creates a false premise that a human can always safely take control of a Tesla vehicle that is managing the driving task or performing in an unexpected manner. Tesla misplaces responsibility in the hands of its drivers to safely conduct a takeover response and control a Tesla when the Autopilot malfunctions. When those drivers ultimately are unable to correct the Autopilot error, Tesla tries to lay the blame for accidents resulting from any of these situations at the feet of its customers.

16. The NTSB has investigated several Tesla-related fatalities. For example, in Mountain View, California, a Tesla's Autopilot malfunctioned, and the vehicle accelerated into a

---

[10] NATIONAL TRANSPORTATION SAFETY BOARD (NTSB), Accident Report NTSB/HAR-20/01 PB2020-100112, "Collision Between a Sport Utility Vehicle Operating With Partial Driving Automation and a Crash Attenuator." Mountain View, California. March 23, 2018., BLOOMBERG NEWS, Tesla Crash in Florida Sparks Transport Safety Board Probe, last visited Mar. 26, 2020, https://www.bloomberg.com/news/articles/2019-03-02/tesla-crash-in-florida-sparks-transport-safety-board-probe.

[11] Ibid, 7

cement median at a merge point of two intersecting highways, killing the driver.[12]  The NTSB investigation resulted in a report published on March 23rd, 2020 which stated, in part:

> Probable Cause - The National Transportation Safety Board determines that the probable cause of the Mountain View, California, crash was the Tesla Autopilot system steering the sport utility vehicle into a highway gore area due to system limitations, and the driver's lack of response due to distraction likely from a cell phone game application and overreliance on the Autopilot partial driving automation system. Contributing to the crash was the Tesla vehicle's ineffective monitoring of driver engagement, which facilitated the driver's complacency and inattentiveness.

17. Furthermore, the NTSB's report noted the following:

a. The Tesla Autopilot system did not provide an effective means of monitoring the driver's level of engagement with the driving task;

b. Because monitoring of driver-applied steering wheel torque is an ineffective surrogate measure of driver engagement, performance standards should be developed pertaining to an effective method of ensuring driver engagement; and

c. In order for driving automation systems to be safely deployed in a high-speed operating environment, collision avoidance systems must be able to effectively detect and respond to potential hazards, including roadside traffic safety hardware, and be able to execute forward collision avoidance at high speeds.

18. The NTSB ultimately recommended that Tesla incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed, or the operational design domain ("ODD").[13]

---

[12] *supra* note 10.
[13] Five automobile manufacturers responded to this recommendation with steps they were taking to address the issue. Tesla, however, has not responded. Tesla has stated that it does not believe such restrictions are applicable to the Autopilot system as long as the driver remains attentive.

19. Prior to the Mountain View, California accident, in March 2019, in Delray Beach, Florida, a 2018 Tesla Model 3 struck a semi-trailer truck when the truck entered the highway without stopping.[14] At the time of the crash, the Tesla's Autopilot system was active, and the Tesla was traveling at 68 mph in a 55-mph posted speed limit area. The Autopilot system and collision avoidance systems did not classify the crossing truck as a hazard, did not attempt to slow the vehicle, and did not provide a warning to the driver of the approaching crossing truck. Further, the driver did not take evasive action in response to the crossing truck.

20. The Tesla Model X, as designed, is not reasonably safe.

*The Purchase of Plaintiffs' Vehicle*

21. In 2015, Chan visited a Tesla's facility in Syosset, New York to speak to Tesla representatives and test drive a Tesla Model S ("Model S Test").

22. At Tesla's facility in Syosset, in connection with the Model S Test, Chan spoke to Tesla employees (the "Syosset Employees"). At this test, Chan explained that he was primarily interested in purchasing a Tesla for its Autopilot features since his daily commute required him to navigate dense traffic on the Long Island Expressway.

23. The Syosset Employees did not advise Chan of the hidden dangers of operating a Tesla vehicle equipped with Autopilot in those situations.

24. During the Model S Test, neither the Syosset Employees nor any other employee or agent of Tesla warned Chan that sometimes and under certain circumstances, the Tesla Autopilot feature is unreliable.

---

[14] This accident is nearly identical to a preceding accident in Williston, Florida, where a Tesla Model S failed to recognize a commercial truck stopped perpendicular to the path of the Tesla operating in Autopilot, resulting in a fatal crash.

25. In late 2015 or early 2016, Chan visited the Tesla's facility in Manhasset, New York to speak to Tesla representatives and test drive a Tesla Model X ("Model X Test").

26. At Tesla's facility in Manhasset, in connection with the Model X Test, Chan spoke to Tesla employees (the "Manhasset Employees"). The Manhasset Employees discussed the Autopilot feature with Chan and allowed Chan to test drive the vehicle with the Autopilot system engaged. Like Chan's conversation with the Syosset Employees, Chan explained that he was interested in using Autopilot in the dense traffic he encountered during his daily commute.

27. During the Model X Test, neither the Manhasset Employees nor any other employee or agent of Tesla warned Chan that Tesla's Autopilot features are inactive or unreliable in certain circumstances.

28. In 2015, Chan placed an order online for a Tesla Model X (the "Tesla Model X").

29. Title to the Tesla Model X was placed in the name of Chan's spouse, Wang, but Chan is the only person to have operated the Tesla Model X. Chan was authorized by Wang to drive the Tesla Model X.

30. On or about September 2016, Chan took delivery of the Tesla Model X at Tesla's facility in Brooklyn, New York ("Tesla Model X Delivery").

31. At Tesla's facility in Brooklyn, in connection with the Tesla Model X Delivery, Chan spoke to Tesla employees (the "Brooklyn Employees").

32. In connection with the Tesla Model X Delivery, neither the Brooklyn Employees nor any other employee or agent of Tesla provided any training to Chan on the Tesla Model X's Autopilot system, or provided Chan with materials regarding the operation and functionality of the Autopilot system. Again, the Brooklyn Employees did not warn Chan that the Model X's Autopilot

features are inactive or unreliable in certain circumstances. Furthermore, Chan did not receive a physical copy of the owner's manual for the Tesla Model X.

33. The Syosset Employees, Manhasset Employees, and Brooklyn Employees each failed, individually and in combination, to adequately warn Plaintiffs of the Model X's limitations and defects. Furthermore, none of Tesla's written materials provided adequate warnings.

34. At no time did Plaintiffs modify the Tesla Model X in any way that might void applicable warranties or cause the Tesla Model X to operate outside its design parameters.

### *The Malfunction and Accident*

35. On December 13, 2017, at or about 4:40PM Eastern Time, Chan was driving the Tesla Model X (hereinafter, the "Vehicle") eastbound in the far-right lane of the Long Island Expressway (U.S. 495) near Exit 26 and 185th Street. Chan was using the Vehicle as it was intended to be used. In fact, Chan was driving in what may be the most common environment for any Tesla sold in metropolitan New York or any other major metropolitan area—dense, slow traffic.

36. At the time of the accident, the Vehicle's Traffic-Aware Cruise Control and Autosteer functions were engaged, with the following distance set at "3"

37. At all-times relevant, Chan remained alert and prepared to resume control of the Vehicle.

38. The Vehicle was following a white tractor-trailer in dense traffic, when, from an entrance ramp to the right, a white Audi began to merge in between the tractor trailer and the Vehicle. At first, as the merging Audi entered the lane between the tractor-trailer and by the Vehicle, the Vehicle decelerated. Unbeknownst to Chan, the Vehicle decelerated because the

9

tractor-trailer he had been following slowed for traffic, not because the Audi had started to enter into Chan's lane of travel.

39. As the Audi was in its merge maneuver, the Vehicle moved forward suddenly and accelerated on a collision course with the Audi. To Chan's surprise, the Vehicle did not recognize that the Audi had merged into the lane of travel that the Vehicle occupied or that the Audi was even present at all. The Vehicle failed to react or warn Chan of the impending collision and failed to deploy its Automatic Emergency Braking.

40. By the time it became clear that the Vehicle had set itself on a collision course with the Audi, Chan had approximately one second to react. Chan intervened as quickly as he could and steered to the left to avoid a collision with the Audi. As a result, Chan instead collided with two other vehicles in the adjoining center and left lane before coming to a stop. The Vehicle again failed to recognize a potential collision with the two adjacent vehicles and failed to deploy the Automatic Emergency Braking.

41. The collision severely damaged the Vehicle and also damaged the two other vehicles. The Vehicle was deemed a total loss.

42. Plaintiff Chan used the Tesla Model X for its intended purpose and in a manner consistent with that of a reasonable, similarly situated driver.

43. Plaintiff Chan was unable, even by the exercise of reasonable care, to avoid the accident.

44. The footage of Plaintiffs' accident is available online at https://www.youtube.com/watch?v=GJJOHauhto0&t=1s.

***Tesla's Excuses***

45. Tesla refuses to take responsibility for the accident. Interestingly, Tesla has previously acknowledged that Autopilot occasionally fails to identify or appropriately respond to white obstacles and slow-moving vehicles.[15]

46. Tesla insists that the Vehicle acted appropriately and that Traffic-Aware Cruise Control and Autosteer "disengaged as designed" when the Vehicle decelerated below the systems' minimum operating speed. Furthermore, Tesla explained that the Vehicle's owner's manual (which is 206 pages long) reminds drivers to remain alert and never rely on Autopilot to steer or decelerate the vehicle.

47. Tesla also relied on the fact that the Model X owner's manual discloses that the vehicle's "Forward Collision Warning and Automatic Emergency Braking functions do not operate at speeds under 4 mph and 5 mph, respectively." Nonetheless, the Model X does not adequately or timely warn the driver when Autopilot functions are disengaged or about to disengage.

48. Tesla's practice of selling or leasing vehicles with Autopilot, without disclosing the defect prior to the time of sale or lease to consumers, as alleged herein, violates generally accepted ethical principles of business conduct.

**FIRST CAUSE OF ACTION**
**Breach of Express Warranty**

49. Plaintiffs repeat and incorporate each and every allegation contained in the preceding paragraphs as though fully set forth herein.

---

[15] TESLA MOTORS. A Tragic Loss. Last accessed March 26, 2019. https://www.tesla.com/blog/tragic-loss.

11

50. Defendants expressly and deliberately represent the Model X as a safe, technologically sophisticated vehicle that is opening the door to fully self-driving vehicles of the future.

51. Defendants expressly and deliberately represent the Tesla Model X's Enhanced Autopilot features as being capable of assisting users with the "burdensome parts of driving" by actively assuming certain decision-making responsibilities and autonomously altering the speed and direction of the vehicle.

52. Defendants make these representations—and allow prospective buyers to act under mistaken beliefs about the capabilities of the Model X—to induce prospective buyers to choose the Model X over other, less sophisticated competitors.

53. Under Uniform Commercial Code section 2-313, as well as other statutes and common law, these representations constitute express warranties.

54. In fact, however, in the most burdensome of traffic conditions, Autopilot simply does not work.

55. By failing to adequately disclose these limitations, Defendants have breached an express warranty regarding the Tesla Model X's capabilities to safely and independently navigate the dense urban environment in which the vehicle is marketed and sold.

56. This express warranty favorably influenced Plaintiffs' decision to buy the Tesla Model X.

57. And this express warranty influenced Plaintiffs' use of the Autopilot functions while driving the Tesla Model X.

58. Plaintiff Chan used the Tesla Model X for its intended purpose and in a manner consistent with that of a reasonable, similarly situated driver.

59. But Defendants breached their express warranties because the Tesla Model X failed to perform in the manner Defendants led Plaintiff Chan to believe it would.

60. Defendants' breach of their express warranty, individually and collectively, caused Plaintiff Chan's accident, resulting in damages to Plaintiffs in amounts to be determined at trial but in no event less than $100,000.

## SECOND CAUSE OF ACTION
### Breach of Implied Warranty

61. Plaintiffs repeat and incorporate each and every allegation contained in the preceding paragraphs as though fully set forth herein.

62. Defendants have an implied duty to produce and market vehicles that are reasonably fit for the ordinary purposes for which such vehicles are used.

63. Defendants produced, marketed, and sold the Model X to operate in, among other circumstances, densely trafficked urban environments.

64. Defendants represented, and allowed prospective buyers to act on the understanding that the Model X's Autopilot functions would operate safely in such an environment.

65. Under Uniform Commercial Code sections 2-314 and 2-315, as well as other statutes and common law, these representations constitute implied warranties that the Tesla Model X was fit for the ordinary purpose for which such vehicles are used.

66. Defendants breached these implied warranties, however, because the Tesla Model X's Autopilot functions in fact operated unreliably and unsafely.

67. Defendants breach of their implied warranty, individually and collectively, caused

13

Plaintiff Chan's accident, resulting in damages to Plaintiffs in amounts to be determined at trial but in no event less than $100,000.

## THIRD CAUSE OF ACTION
### Negligent Marketing

68. Plaintiffs repeat and incorporate each and every allegation contained in the preceding paragraphs as though fully set forth herein.

69. All Defendants knew, or in the exercise of reasonable care should have known, that the Model X Autopilot features were not reasonably safe. Tesla intentionally designed those features to operate as they do, and Tesla marketed those features to induce potential customers to buy the Model X.

70. Plaintiffs relied on Defendants' representations and omissions when they purchased and operated the Tesla Model X.

71. As such, each Defendant, individually and collectively, had a duty to adequately warn Plaintiffs of the dangers inherent in the Tesla Model X's Autopilot features.

72. Each Defendant, individually and collectively, breached this duty by failing to provide adequate, if any, warnings.

73. The Defendants' negligence, individually and collectively, caused Plaintiff Chan's accident, resulting in damages to Plaintiffs in amounts to be determined at trial but in no event less than $100,000.

## FOURTH CAUSE OF ACTION
### Deceptive and Misleading Business Practices

74. Plaintiffs repeat and incorporate each and every allegation contained in the preceding paragraphs as though fully set forth herein.

75. Pursuant to New York General Business Law ("GBL") § 349, Plaintiffs bring this action against Defendants who repeatedly have engaged in fraudulent and deceptive practices to Plaintiffs.

76. Defendants engaged in consumer-related activities that affected consumers at large.

77. One of Defendants' engaged consumer-related activities is the dissemination of advertising through various mediums.

78. The disseminated advertising contained information that is deceptive in material aspects.

79. The disseminated deceptive advertising caused Plaintiff Chan's reliance on the Autopilot technology of Tesla, a Defendant.

80. Tesla's Autopilot technology did not function as Defendants had advertised.

81. A reasonable person who knew of this potential for causing injury would have concluded that the Tesla Model X should not have been sold with these defectively designed Autopilot features. Tesla placed the needs of its business interest ahead of the interest of its customers and those who could be injured or suffer damages as a result of these unsafe Tesla vehicles.

82. Tesla needed to sell these unsafe vehicles and put these vehicles on the road way so that they could generate and capture data all the while touting them as the safest on the road. This was dishonest and placed its customers and the public at risk all in violation of New York law.

83. Plaintiff Chan's incident occurred as a result of Tesla's failed Autopilot technology, but the marketing and sale of the Model X was founded on Tesla's purposeful misleading business

practices designed to sell cars, get more Teslas on the road, gather more data, use that data to enhance Tesla's products, and position itself in the marketplace.

84. Defendant's violation of GBL § 349 caused Plaintiff Chan's accident, resulting in damages to Plaintiffs in amounts to be determined at trial but in no event less than $100,000.

## FIFTH CAUSE OF ACTION
## Fraudulent Business Practices

85. Plaintiffs repeat and incorporate each and every allegation contained in the preceding paragraphs as though fully set forth herein.

86. Pursuant to a claim for fraud under New York common law, Plaintiffs bring this action against Defendants who repeatedly have engaged in fraudulent and deceptive practices to Plaintiffs.

87. Defendants represented that its Autopilot is safe and ready to be used in common traffic situations.

88. The Autopilot function is not safe nor ready to be used in traffic situations.

89. Defendants knew that the Autopilot function is not safe nor ready to be used in traffic.

90. Tesla sells its vehicles on the basis that if its vehicles fail to perform, the driver is responsible, even when it is impossible for a human being to reasonably appreciate that a failure is occurring, or comprehend how the driver should take control.

91. Plaintiffs relied on Defendant's representation and utilized the Autopilot technology.

92. Plaintiff Chan's incident occurred as a result of the failed Autopilot technology and the sale of that technology under false pretenses constitutes fraudulent business practices.

93.     Defendants' fraudulent practices formed the basis of Plaintiffs' buying decision and ultimately led to the Tesla causing Plaintiff Chan's accident, resulting in damages to Plaintiffs in amounts to be determined at trial but in no event less than $100,000.

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.      An award of damages, against Defendants, in an amount to be determined at trial, including but not limited to the value of the damage to the Vehicle, and in no event less than $100,000;

B.      Treble, punitive and exemplary damages; and

C.      Such other and further relief as the Court deems just and proper, including counsel fees, costs of court, and pre-judgment interest.

Dated:   New York, New York
         May __, 2020

                                        NELSON LAW, LLC

                                        BY:  /s/ MICHAEL R. NELSON
                                        Nelson Law, LLC
                                        Michael R. Nelson
                                        nelson@nelson.legal
                                        200 Park Ave., Suite 1700
                                        New York, NY 10166
                                        Telephone:(212) 457-1668
                                        Facsimile: (646) 766-9945

        Attorney for Plaintiffs Wai-Leung Chan and Jing Wang