**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

JING WANG and WAI-LEUNG CHAN,

                              Plaintiffs,

        - against -

TESLA, INC.,

                           Defendant.

**Civ. Action No. 1:20-cv-3040**

## TESLA, INC.'S MEMORANDUM OF LAW AND STATEMENT OF MATERIAL FACTS IN SUPPORT OF RULE 56 MOTION FOR SUMMARY JUDGMENT OF PLAINTIFFS' SECOND AMENDED COMPLAINT

BOWMAN AND BROOKE LLP
Thomas P. Branigan, Esq. (*Pro Hac Vice*)
Matthew G. Berard, Esq. (*Pro Hac Vice*)
41000 Woodward Ave., Suite 200E
Bloomfield Hills, Michigan 48304
(248) 201-3300

And

AARONSON RAPPAPORT FEINSTEIN &
DEUTSCH, LLP
600 Third Avenue
New York, New York 10016
(212) 593-6700
Our File No.: 5003.015

*Attorneys for Defendant*
TESLA, INC.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

STATEMENT OF MATERIAL FACTS ......................................................................... vi

INTRODUCTION ....................................................................................................1

FACTUAL BACKGROUND ......................................................................................3

    A. *Plaintiffs' Second Amended Complaint ("SAC")* ..................................3

    B. *Plaintiffs' Purchase of the Subject Vehicle* ........................................4

    C. *Tesla's Owner's Manual* ....................................................................5

    D. *The Accident* ......................................................................................6

    E. *Expert Analysis by the Parties* ...........................................................8

    F. *The Assignment of Benefits* ................................................................9

ARGUMENT ........................................................................................................10

    A. Rule 56 Legal Standard.....................................................................10

    B. Plaintiffs' Alleged Design Defect Cannot Establish a Breach of Express Warranty10

    C. Plaintiffs' Breach of Implied Warranties of Merchantability and Fitness for a Particular Purpose Similarly Cannot Be Established.............................................16

    D. Tesla Provided Warnings Plaintiff Chan was Well-Aware of During the Accident but Failed to Obey..................................................................................18

    E. Plaintiffs' Deceptive and Misleading Trade Practice and False Advertising Claims are Time Barred and Otherwise Fail as a Matter of Law.......................................22

    F. Plaintiffs Cannot Demonstrate a Negligent Misrepresentation Claim in a Typical Consumer Arms-Length Transaction..................................................................28

    G. Plaintiffs' Assignment of Rights is Invalid and Plaintiffs Suffered No Damages.32

    H. Plaintiffs' Claim for Punitive or Exemplary Damages are Inappropriate..............34

CONCLUSION.....................................................................................................35

## Cases

*Ackerman v. Coca-Cola Company*, CV-09-0395 (JG) (RML), at *52-53 (E.D.N.Y. July 21, 2010) .................................................................................................................................... 17

*Action S.A. v. Marc Rich Co., Inc.*, 951 F.2d 504, 509 (2d Cir. 1991) ........................................ 34

*Aetna Cas. and Sur. v. Aniero Concrete*, 404 F.3d 566, 584 (2d Cir. 2005) ......................... 29, 30

*Allegheny Coll. v. Nat'l Chautauqua Cty. Bank of Jamestown*, 246 N.Y. 369, 373 (1927)......... 32

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243, 256 (1986) ........................................... 10, 19

*Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012).......................... 29

*Aretakis v. Caesars Entm't*, 16 Civ. 8751 (KPF), at *16-17 (S.D.N.Y. Feb. 23, 2018)......... 33, 34

*Arthur Glick Leasing, Inc. v. William J. Petzold, Inc.,* 51 A.D. 3d 1114, 1116, 858 N.Y.S. 2d 405 (3d Dep't 2008)................................................................................................................... 12

*Avola v. La.-Pac. Corp.,* No. 11–CV–4053 (PKC), 2013 WL 4647535, at *6 (E.D.N.Y. Aug. 28, 2013) ............................................................................................................................... 11, 12

*Baron v. Pfizer, Inc.,* 42 A.D. 3d 627, 629, 840 N.Y.S. 2d 445 (3d Dep't 2007)........................ 25

*Bautista v. CytoSport, Inc.*, 223 F. Supp. 3d 182, 193 (S.D.N.Y. 2016) ..................................... 31

*Beneway v. Superwinch, Inc.*, 216 F.Supp.2d 24, 30 (N.D.N.Y. 2002)....................................... 16

*Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993)........................................... 25, 27

*CBS Inc. v. Ziff–Davis Publ'g Co.,* 75 N.Y. 2d 496, 502–04, 554 N.Y.S. 2d 449, 553 N.E. 2d 997 (1990) ..................................................................................................................................... 12

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ............................................................... 10

*Citibank, Nat'l Ass'n v. London*, 526 F. Supp. 793, 803 (S.D. Tex. 1981) ................................. 32

*City of New York v. Smokes–Spirits.Com, Inc.,* 12 N.Y. 3d 616, 621, 883 N.Y.S. 2d 772, 911 N.E. 2d 834 (2009)................................................................................................................ 25

*Colpitts v. Growers*, 20 Civ. 2487 (JPC), at *28 (S.D.N.Y. Mar. 16, 2021) ......................... 30, 31

*Cummings v. FCA US LLC*, 401 F. Supp. 3d 288, 314 (N.D.N.Y. 2019) .............................. 14, 15

*Cwiklinksi v. Sears, Roebuck & Co., Inc.*, 70 AD3d 1477, 1478–79 (N.Y. Sup. Ct. 2010) ......... 21

*Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003)............................... 30

*Daniels v. Forest River, Inc.,* No. 07–4227, 2013 WL 3713464, at *3 (Sup. Ct. Suffolk Cnty. June 28, 2013)....................................................................................................................... 12

*De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 317 n.18 (S.D.N.Y. 2013) .................. 12

*Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 263 (N.Y. 1995) ....................................................... 17

*Derienzo v. Trek Bicycle Corp.*, 376 F.Supp.2d 537, 570 (S.D.N.Y.2005).................................. 16

*Donald v. Shinn Fu Co. of Am.*, 2002 WL 32068351, 99-CV-6397, *4 (E.D.N.Y. Sept. 4, 2002) .............................................................................................................................................. 17

*Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346-47 (S.D.N.Y. 2020) ...................... 26, 27

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 188 (2d Cir. 2004) ..................................................................................................................................... 30

*Fairchild Hiller Corp. v. McDonnell Douglas Corp.*, 28 N.Y.2d 325, 329 (1971)..................... 33

*Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.,* 689 F. Supp. 2d 585, 604 (S.D.N.Y. 2010) ..................................................................................................................... 11

*Fink v. Time Warner Cable,* 714 F.3d 739, 741 (2d Cir. 2013), *aff'g* 837 F. Supp. 2d 279 (S.D.N.Y. 2011) ..................................................................................................................... 25

*Fisher v. Flanigan*, 89 A.D.3d 1398 (N.Y. Sup. Ct. 2011) ....................................................... 21

*Frazer v. ITW Food Equip. Grp. LLC*, No. 11-CV-9699 (CS), at \*12-13 (S.D.N.Y. Nov. 22, 2013) ............................................................................................................................ 21, 22

*Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212, 226-27 (S.D.N.Y. 2015) ............................ 13

*Geressy v. Digital Equipment Corp.*, 950 F. Supp. 519, 523 (E.D.N.Y. 1997) ............................ 34

*Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 482 (S.D.N.Y. 2014) . 13, 24, 25

*Gonzalez by Gonzalez v. Morflo Indust., Inc.,* 931 F.Supp. 159, 167 (E.D.N.Y. 1996) ......... 16, 17

*Goshen v. Mut. Life Ins. Co. of N.Y.,* 98 N.Y. 2d 314, 324, 746 N.Y.S. 2d 858, 774 N.E. 2d 1190 (2002) ..................................................................................................................................... 25

*Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38, 75 (E.D.N.Y. 2017) ............................... 30, 31

*Greenfield v. Professional Care, Inc.*, 677 F. Supp. 110, 117 (E.D.N.Y. 1987) .......................... 35

*Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v. AT & T Commc'ns. Inc.*, 92-CV-7862, 1996 WL 312535, at \*7 (S.D.N.Y. June 10, 1996) .......................................................... 14

*Guariglia v. Procter & Gamble Co.*, 2:15-cv-04307 (ADS) (SIL) (E.D.N.Y. Mar. 14, 2018) .... 13

*Haag v. Hyundai Motor America*, 294 F. Supp. 3d 102, 105 (W.D.N.Y. 2018) .......................... 13

*Hall v. Husky Farm Equip., Ltd.*, 92 A.D.3d 1188, 1190-91 (N.Y. App. Div. 2012) ................. 21

*Henry v. Rehab Plus Inc.*, 404 F.Supp.2d 435, 442 (E.D.N.Y. 2005) ................................... 18, 19

*Howard v. Poseidon Pools, Inc.*, 530 N.E.2d 1280, 1281, 72 N.Y.2d 972 (1988) ...................... 22

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,* Nos. 4–CV–2389, 04–CV–3417, 04–CV–5424, 2007 WL 1601491, at \*14 (S.D.N.Y. June 4, 2007) ........................................ 24

*Justinian Capital SPC v. WestLB AG*, 28 N.Y.3d 160, 166 (2016) ............................................ 33

*Kacocha v. Nestle Purina Petcare Co.*, No. 15-CV-5489 (KMK), 2016 WL 4367991, at \*16 (S.D.N.Y. Aug. 11, 2016) .................................................................................................... 25, 27

*Kimmell v. Schaefer*, 89 N.Y. 2d 257, 264, 652 N.Y.S. 2d 715, 675 N.E. 2d 450 (1996) ........... 30

*Koublani v. Cochlear Ltd.*, 2:20-cv-1741 (DRH) (AYS), at \*27 (E.D.N.Y. June 23, 2021) ....... 13

*Landesbank Baden–Wurttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 623–34 (S.D.N.Y. 2011) ......................................................................................................................... 30

*Liberty Media Corp. v. Vivendi Universal, S.A. (In re Vivendi Universal, S.A. Sec. Litig.),* Nos. 02 Civ. 5571(RJH), 03 Civ. 2175(RJH), 2004 WL 876050, at \*10 (S.D.N.Y. Apr. 21, 2004) 12

*Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995) .............................................................. 26

*Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237, 677 N.Y.S.2d 764, 700 N.E.2d 303 (1998) .. 18, 19

*Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 241 (S.D.N.Y. 2020) ............. 25

*M & T Mortgage Corp. v. Miller,* No. 02–CV–5410, 2009 WL 3806691, at \*2 (E.D.N.Y. Nov. 13, 2009) ................................................................................................................................... 23

*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y. 3d 173, 180 (2011) ......................................... 29

*Marshall v. American*, 51 F. Supp. 3d 451, 461 (S.D.N.Y. 2014) .............................................. 23, 24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986) ........................... 10

*Miller v. Hyundai Motor Am.*, 15-CV-4722, 2017 WL 4382339, at \*4 (S.D.N.Y. Sept. 29, 2017) ............................................................................................................................................. 13, 15

*Monell v. Scooter Store, Ltd.*, 895 F.Supp.2d 398, 416 (N.D.N.Y. 2012) ............................. 16, 19

*Moses v. McDivitt*, 88 N.Y. 62, 65 (1882) .................................................................................. 33

*Narvaez v. Wadsworth*, 165 A.D.3d 407 (N.Y. Sup. Ct. 2018) ................................................... 21

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y. 2d 20, 25, 623 N.Y.S. 2d 529, 647 N.E. 2d 741 (1995) ........................................................................... 25

*Parker v. Raymond Corp.*, 87 A.D. 3d 1115, 1117, 930 N.Y.S. 2d 27 (2d Dep't 2011) ............. 13

*Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 528 n.14 (S.D.N.Y. 2003) .................. 26, 27

*Pierre v. Hilton Rose Hall Resort & Spa*, 14 Civ. 3790 (VMS), at *14-15 (E.D.N.Y. Sep. 12, 2016) ............................................................................................................................................ 22

*Potler v. MCP Facilities Corp.*, 471 F. Supp. 1344, 1349 (E.D.N.Y. 1979). .............................. 17

*Preira v. Bancorp Bank,* 885 F. Supp. 2d 672, 676 (S.D.N.Y. 2012) ......................................... 25

*Randy Knitwear, Inc. v. Am. Cyanamid Co.,* 11 N.Y. 2d 5, 14, 226 N.Y.S. 2d 363, 181 N.E. 2d 399 (1962) ................................................................................................................................... 12

*Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289, 297, 591 N.E.2d 222, 582 N.Y.S.2d 373 (1992) ................................................................................................................................... 18

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) ............................................ 32

*Rogers v. Westfalia Associated Techs.*, 485 F.Supp.2d 121, 129 (N.D.N.Y. 2007) .................... 22

*Santoro ex rel. Santoro v. Donnelly*, 340 F.Supp.2d 464, 485–86 (S.D.N.Y. 2004) ................... 19

*Sarr v. BEF Foods, Inc.*, No. 18 Civ. 6409 (ARR), 2020 WL 729883, at *6 (E.D.N.Y. Feb. 13, 2020) ................................................................................................................................... 29, 30

*Scottxo v. Almenas*, 143 F.3d 105, 114 (2nd Cir. 1998). ............................................................ 10

*Small v. Lorillard Tobacco Co.,* 94 N.Y. 2d 43, 56, 698 N.Y.S. 2d 615, 720 N.E. 2d 892 (1999) ....................................................................................................................................................... 25

*Spagnola v. Chubb Corp.,* 574 F.3d 64, 74 (2d Cir. 2009) ......................................................... 25

*Statler v. Dell, Inc.,* 775 F. Supp. 2d 474, 484 (E.D.N.Y. 2011) ........................................... 23, 24

*Statler v. Dell, Inc.,* 841 F. Supp. 2d 642, 648 (E.D.N.Y. 2012) ("*Statler II*") ........................... 23

*Stoltz v. Fage Dairy Processing Indus., S.A.*, 14 Civ. 3826 (MKB), 2015 WL 5579872, at *24 (E.D.N.Y. Sept. 22, 2015) ........................................................................................................ 30

*Stone v. Sutton View Capital, LLC*, No. 17 Civ. 1574 (VEC), 2017 WL 6311692, at *4 n.7 (S.D.N.Y. Dec. 8, 2017) ............................................................................................................ 32

*Sugawara v. Pepsico, Inc.*, No. 2:08-cv-01335-MCE-JFM, 2009 WL 1439115, at *5 (E.D. Cal. 2009) .......................................................................................................................................... 17

*Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007) ............. 25, 26, 27

*Tr. for the Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding Corp.*, 13 N.Y.3d 190, 198 (2009) ...................................................................................................... 33, 34

*Viscusi v. Proctor Gamble*, No. 05-CV-01528 (DLI) (LB), 2007 WL 2071546, at *13 (E.D.N.Y. July 16, 2007) ............................................................................................................................ 17

*Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464 (1982) ......................................................... 32

*Wender v. Gilberg Agency*, 276 A.D. 2d 311, 716 N.Y.S. 2d 40, 41–42 (2000) ......................... 24

*White v. Guarente*, 43 N.Y. 2d 356, 361 (1977) ........................................................................ 29

*Whitney v. Citibank, N.A.*, 782 F.3d 1106 (2d Cir. 1986) .......................................................... 35

*Wrap-N-Pack, Inc. v. Kaye*, 528 F. Supp. 2d 119, 123-24 (E.D.N.Y. 2007) .............................. 34

## Statutes

15 U.S.C. ch. 50 § 2301 ............................................................................................................. 13

350 ............................................................................................................................... 23, 24, 25

N.Y. C.P.L.R. § 214(2) ............................................................................................................... 23

N.Y. G.B.L. §§ 349 ......................................................................................................... 23, 24, 25

N.Y. Gen. Bus. Law Section 198-a ............................................................................................. 13

N.Y. U.C.C. § 2–313(1)(a) ................................................................................................... 11, 12

N.Y. U.C.C. § 2-314 ................................................................................................................... 17

## <u>Rules</u>

FED. R. CIV. P. 12(b)(6) ....................................................................................... 29, 35

FED. R. CIV. P. 56 ................................................................................................ vi, 10

<u>**STATEMENT OF MATERIAL FACTS¶**</u>

Tesla, Inc. ("Tesla"), by its attorneys, Bowman and Brooke LLP and Aaronson Rappaport Feinstein & Deutsch, LLP, submits its Statement of Material Facts in Support of its Rule 56 Motion for Summary Judgment of Plaintiffs' Second Amended Complaint as follows:

1.      Plaintiffs Jing Wang and Wai-Leung Chan (collectively referred to as "Plaintiffs") purchased a 2016 Tesla Model X (the "Subject Vehicle") with the Autopilot suite of advanced driver assistance (ADAS) features in September 2016. (Dkt. 71, Plaintiffs' Second Amended Complaint (SAC) at ¶¶ 28-30).

2.      Plaintiff Chan also allegedly visited Tesla's Syosset and Manhasset showrooms, where he test drove a Tesla Model S and Model X. (SAC ¶¶ 25, 28). In fact, Plaintiff Chan drove with the Autopilot engaged during his test drive of the Subject Vehicle. (SAC ¶ 30, 31).

3.      Plaintiff Wang confirmed at her deposition that the Subject Vehicle was titled in her name but it was her husband's idea to purchase the vehicle. (Exhibit C, Deposition Trans. of Plaintiff Wang at 15: 5-25). She was unaware why Plaintiff Chan wanted to purchase the vehicle and had no personal interest in purchasing the vehicle. (*Id.*).

4.      The Tesla 2016 Model X Owner's Manual specifically warns drivers: "Never depend on these components to keep you safe. It is the driver's responsibility to stay alert, drive safely, and be in control of the vehicle at all times." (See Exhibit D, Tesla Model 2016 X Owner's Manual).

5.      There are numerous other statements in the Owner's Manual that warn and remind a driver of their "responsibility to stay alert, drive safely, and be in control of the vehicle at all times," as well as statements that disclose limitations of the technology.[1]

---

[1] The ADAS on the Subject Vehicle is known as "Autopilot." Autopilot is a suite of separate advanced driver assistance features including Autosteer (lane keeping assist), Traffic Aware Cruise Control, Forward Collision Warning,

6.      Plaintiff Chan testified that there were numerous aspects of the Subject Vehicle of interest to him, namely Autopilot and the vehicle being fully electric (reducing pollution and making the vehicle quiet). (Exhibit B, Plaintiff Chan's Deposition Trans. at 52: 19-25; 53: 1-24).

7.      Plaintiff Chan was aware before test driving the Subject Vehicle that it was not "fully" autonomous or self-driving. (*Id.* at 55: 7-25; 56: 1-14; 57:6-15). Plaintiff Chan even used Autopilot when driving a 2016 Model X (the same make and model of the Subject Vehicle) during a test drive. (*Id.* at 60: 3-21; 61: 21-25).

8.      Plaintiff Chan only asked whether Ms. Meghan Mack, the sales associate on the test drive, was "sure" Autopilot worked during the test drive and observed, "…the car really stops and go and steers and drive, you know, so I said, oh, great, you know, that works, you know." (*Id.* at 61: 12-20).

9.      Plaintiff Chan further testified as follows:

> Q.      Is it your testimony, sir, that based on the information that you read on Tesla's website, between the time that you took a test drive and the time that you took delivery, that you believed that when you had autopilot engaged, you would not have to do any driving or be responsible for any driving?
>
> ***
>
> THE WITNESS: I believe -- I believe under the Tesla website, from what I remember, that we still have to pay attention to the traffic, you know. You still have to use your hand on the steering wheel, you know. You have to, you know -- just in case something happened, you still have to take control of the car.

(*Id.* at 72: 20-25; 73: 1-15).

---

Automatic Emergency Braking, Blind Spot Warning, Lane Departure Warnings/Avoidance, Auto Highbeam, Autowipers, Autopark, Summon, and more. Autopilot is not "self-driving." It does not make the Subject Vehicle "autonomous." It is undisputed that Autopilot is an SAE Level 2 system which requires the human driver to pay full attention ("monitor the driving environment") at all times.

10.     Plaintiff Chan wholly agreed that he was still fully responsible for driving the vehicle based on the information he read from Tesla's website prior to taking delivery of the vehicle. (*Id.* at 73: 17-22). According to Plaintiff Chan, "…I remember maybe, you know, there [sic] it is a – a caution on the website that, you know, the owner need to take control of the car if something happens…[s]ome emergency happened that, you know, the driver have to be aware, you know; they have to take control." (*Id.* at 74: 15-22).

11.     Plaintiff Chan testified that he sat down and read the Owner's Manual that was available within the Subject Vehicle through its touchscreen shortly after bringing the vehicle home. (*Id.* at 91: 9-25; 92: 1-10). Specifically, he recalled reading the warning statements contained within the Owner's Manual at that time, well before the subject incident. (*Id.* at 95: 9-25).

12.     These warnings and instructions advised that it was his responsibility as the driver to stay alert, drive safely, and be in control of the vehicle at all times. (*Id.* at 98: 9-20). Further, he affirmed that he was never to depend on Traffic-Aware Cruise Control to adequately slow down the Subject Vehicle. (*Id.* at 98: 9-20). Plaintiff Chan knew that Tesla, through the Owner's Manual and its website warned him not to use Traffic-Aware Cruise Control on city streets or on roads where traffic conditions were constantly changing. (*Id.* at 99: 24-25; 100: 1-4).[2] Plaintiff Chan also testified that he knew Autopilot was a Beta feature based on his recollection of what was shown on the main display screen within the Subject Vehicle. Chan's description is consistent with a

---

[2] While Ms. Meghan Mack's alleged statements about operating the Subject Vehicle are mere puffery; the Owner's Manual's warning closely aligns with the representation that Plaintiff Chan attributes to her, that he could drive the Subject Vehicle in the high-occupancy vehicle lane of the Long Island Expressway utilizing Autopilot, and her warning to not use it on side streets or in city driving.

warning that pops up with each Autopilot activation[3], or otherwise he was describing what he learned from the Owner's Manual.  (*Id.* at 79: 3-13).

13.     He testified that these warnings in the Owner's Manual were viewed well in advance of the subject incident. (*Id.* at 95: 22-25; 96: 1-8) (CHAN: ". . . but when I read this, I say, 'You know what? I still have to – you know - you know, I still have to be aware of the traffic situation, you know.'").

14.     Plaintiff Chan had traveled Eastbound on the Long Island Expressway near 185 many times before the incident. (*Id.* at 113:8-15). Further, he frequently traveled the Long Island Expressway in the Subject Vehicle with Autopilot engaged. (*Id.* at 137:11-20).

15.     On December 13, 2017, just before the incident, Plaintiff Chan had just merged "from the surface" or the merging lane and was in the first lane of travel on the right-hand side of the road. (*Id.* at 115:7-15).

16.     Plaintiff Chan agreed that, as a driver in rush hour traffic on the Long Island Expressway, it is important for a driver to pay attention because other drivers are sometimes changing lanes, sometimes stopping quickly. (*Id.* at 119:25, 120:1-5).

17.     Plaintiff Chan had a dashboard video camera that was recording the entire incident. (*Id.* at 127:8-10). He agreed that the below image demonstrates the white Audi SUV merging into the right-hand lane in front of the Subject Vehicle and behind a tractor-trailer. (*Id.* at 129).

---

[3] Before Autopilot can be engaged during any drive, the driver must first activate Autopilot within the main display settings, thereby making it available to be engaged during a drive.



18.     He agreed "there's enough space" for the white Audi to merge into his lane of travel at this time. (*Id.* at 130:7-10).

19.     Plaintiff Chan could have stopped or slowed the Subject Vehicle by pressing the brake pedal but he did not do so "because the car stop by itself at this point." (*Id.* at 131:7-14).

20.     Plaintiff Chan also testified, "…it's a natural reaction that I turn the wheel to the left and try to avoid hitting the Audi, and that's the first time I turn my steering wheel, after the Audi merge…in front of me." (*Id.* at 132:1-8). He firmly believes "I press on the brake" and not the accelerator pedal when he moved his steering wheel to the left. (*Id.* at 132:9-11).

21.     Plaintiff Chan maintained this position after he drove his Tesla into two other motor vehicles: "…then after hitting the second car…I just bounced back to the seat, so my foot released on the brake. I did not press on the brake anymore…and then after this, I reapplied the brake and this time the brake works, so the car come to a full stop after the second impact." (*Id.* at 133:18-25, 134:1-2).

22.     He had no problems with Autopilot functioning in any of his prior trips on the Long Island Expressway in either direction. (*Id.* at 137:22-25, 138:1-2).

23.     Plaintiffs disclosed three purported experts in this case in the areas of accident reconstruction (Mr. Daniel Desautels), human factors (Dr. Jason Droll), and motor vehicle valuation (Mr. John "Jack" Donachie).[4] Tesla's objections to Plaintiffs' experts are outlined in separate Motions to Strike under Rule 702. Thus, Tesla incorporates by reference here its arguments in those Motions and it will not address the reports and testimony of the respective experts in this Motion.

24.     Plaintiff Chan confirmed that after the accident his insurer Progressive paid his claim: "They paid my claim in full, yes." (*Id.* at 25:20-25, 26:1). Specifically, "they told me the car is like…it's like a total loss, you know, so they give me just the residual value of the car…I think around $100,000" (*Id.* at 26:9-14).

25.     Plaintiffs' First Amended Complaint, filed August 31, 2020, made no mention of any assignment of benefits. (Dkt. 18, Plaintiffs' First Amended Complaint).

26.     However, Plaintiffs' SAC alleges (after payment was made on the claim to Plaintiffs) that "Plaintiffs' insurer absolutely and irrevocably assigned and transferred to Plaintiffs its right of subrogation related to the claim, thereby authorizing Plaintiffs to pursue those rights along with any other rights, claims, causes of action, or interests the insurer may have in connection with the claim or the collision, and to recover all proceeds that may be obtained." (Dkt. 71 at ¶ 44, pg. 12).

27.     This "Assignment of Subrogation Rights and Proceeds" was "executed" on December 15, 2020 by Mr. Michael Tyminski of Progressive Northeast Insurance Company. (Exhibit E, Assignment of Subrogation Rights and Proceeds).

---

[4] Tesla has simultaneously filed three Motions to Strike Plaintiffs' experts Mr. Daniel Desautels, Dr. Jason Droll, and Mr. Jack Donachie under FRE 702. If any of the Motions are granted by the Court, it necessarily establishes that Plaintiffs cannot maintain any of their causes of action against Tesla.

28.     The "Assignment" states "ASSIGNOR UNDERSTANDS THAT IT IS EXPRESSLY ASSIGNING ITS RIGHT OF SUBROGATION FOR THE FULL AMOUNT PAID IN SETTLEMENT OF ITS CLAIM NUMBER 17-1468387, AND ANY OTHER AMOUNTS RELATED THERETO." (*Id.*).

29.     Notably, there is no statement of consideration or mention of consideration for the Assignment and it is not signed by Plaintiffs. (*Id.*). Thus, the Assignment appears to lack validity on its face.

30.     The Court entered a Memorandum and Order Granting in Part and Denying in Tesla's Rule 12 Motion to Dismiss Plaintiffs' Complaint [5] which dismissed Count VI (Common Law Fraud/Fraudulent Misrepresentation) of Plaintiff's Complaint on July 16, 2021. (Dkt. 68).

31.     In pertinent part, this Court held that:

> Plaintiffs, however, have not alleged with any specificity what alleged defects were concealed from them, nor have they adequately alleged that information regarding the limitations of the technology was unavailable to them via Tesla's website, the Model X owner's manual, or other publicly available sources. Accordingly, the facts alleged do not give rise to a claim that Tesla committed fraud by failing to affirmatively disclose 'special facts' that were known to Tesla and unknowable by Plaintiffs.

(Dkt. 68 at 9).

32.     Further, Plaintiffs' unqualified "experts" and Plaintiff Chan's deposition testimony establish the absence of admissible evidence to support Plaintiffs' claim of a "defect" in the Subject Vehicle's advanced driver assistance systems (ADAS) comprised of a suite of features that combine to form Autopilot.

---

[5] This Court denied Tesla's Motion to Dismiss only relating to Tesla's request to strike certain allegations contained in Plaintiffs' First Amended Complaint.

33.     Despite the technical analysis and questioning of Autopilot, even Plaintiffs' experts agree that a simple pedal misapplication (manually overriding Autopilot) by Plaintiff Chan caused the Subject Vehicle to accelerate into two other motor vehicles.

34.     Plaintiff Chan reacted by depressing the accelerator pedal 100% and veering left eventually crashing into two other vehicles before coming to rest.

35.     Plaintiff Chan suffered no personal injuries and his insurance company, Progressive Insurance Company ("Progressive"), paid him in full for the damage to the Subject Vehicle resulting in no damage befalling Plaintiffs.

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Tesla, Inc. ("Tesla"), by its undersigned Counsel, submits its Memorandum of Law in Support of its Rule 56 Motion for Summary Judgment of Plaintiffs' Second Amended Complaint:

**INTRODUCTION**

Plaintiffs Jing Wang and Wai-Leung Chan (collectively referred to as "Plaintiffs") purchased a 2016 Tesla Model X (the "Subject Vehicle") with Autopilot in 2016. Plaintiff Chan claims he regularly used the Subject Vehicle for his daily commute until it was damaged during a collision, allegedly while Autopilot was engaged. In their Second Amended Complaint, Plaintiffs generally allege that Autopilot is defectively designed, that the Subject Vehicle is not reasonably safe, and that Tesla committed fraud and engaged in "deceptive and misleading business practices" in connection with the sale of the Subject Vehicle to Plaintiff Chan.

For the reasons stated below, Tesla's Motion for Summary Judgment of all the remaining counts can and should be granted. This Motion is based in part on this Court's July 16, 2021 Memorandum and Order Granting in Part and Denying in Tesla's Rule 12 Motion to Dismiss Plaintiffs' Complaint[6] which dismissed Count VI (Common Law Fraud/Fraudulent Misrepresentation) of Plaintiff's Complaint. Quite simply, Plaintiffs cannot set forth a scintilla of evidence to support their claims under the remaining counts, especially after this Court found Tesla's alleged statements about the Subject Vehicle do not give rise to an actionable claim for fraud. In pertinent part, this Court held that:

> Plaintiffs, however, have not alleged with any specificity what alleged defects were concealed from them, nor have they adequately alleged that information regarding the limitations of the technology was unavailable to them via Tesla's website, the Model X owner's manual, or other publicly available sources. Accordingly, the facts alleged do not give rise to a claim that Tesla committed fraud by

---

[6] This Court denied Tesla's Motion to Dismiss only relating to Tesla's request to strike certain allegations contained in Plaintiffs' First Amended Complaint. (Dkt. 68).

> failing to affirmatively disclose 'special facts' that were known to
> Tesla and unknowable by Plaintiffs.

(Dkt. 68, July 16, 2021 Memorandum and Order re Tesla's Motion to Dismiss Count VI under

FED. R. CIV. P. 12(b)(6) at 9).

Further, Plaintiffs' unqualified "experts" and Plaintiff Chan's deposition testimony fails to establish a "defect" in the Subject Vehicle. Even Plaintiffs' experts agree that Plaintiff Chan's pedal misapplication, where he accidentally pressed the accelerator when he meant to press the brake, but which also overrode Autopilot, caused the Subject Vehicle to accelerate into other vehicles. Plaintiff Chan negligently reacted to his unfounded belief that Autopilot did not detect a merging white Audi Q5 by depressing the accelerator pedal 100% and veering left eventually crashing into two other vehicles before coming to rest. Importantly, to even have a chance of prevailing, Plaintiffs' experts must be able to prove that, had Plaintiff Chan not intervened and overrode Autopilot, that Autopilot would have allowed his Model X to crash. They cannot. And since they cannot, then so far as anyone is concerned, given the chance Autopilot *would have* detected the merging Audi and *would have* slowed/stopped to avoid a collision and there would be no lawsuit. Thus, the only reason this litigation exists is because Plaintiff Chan unreasonably and negligently intervened, pressed the accelerator to 100% and caused the crash. Fortunately, Plaintiff Chan suffered no personal injuries and his insurance company, Progressive Insurance Company ("Progressive"), paid him in full for the damage to the Subject Vehicle resulting in no damage befalling Plaintiffs.

Curiously, after paying Plaintiffs the value of the Subject Vehicle and disposing of the car, Progressive then purported to assign its right to subrogate for Plaintiffs' loss back to Plaintiffs. This purported assignment of rights is invalid when made to Plaintiffs who received the entire payment of the alleged total loss and lacked sufficient consideration to form a valid contract. If

Plaintiffs do not hold a valid assignment of rights, then each and every claim alleged in the Second Amended Complaint is invalid as a matter of law.

Overall, Plaintiffs lack sufficient allegations or proofs to support conclusory allegations that cannot satisfy the requisite elements of a breach of express warranty claim, breach of implied warranty of merchantability, breach of the implied warranty of fitness for a particular purpose, failure or inadequate warnings, a deceptive trade practice and false advertising claim under New York law, and a negligent misrepresentation claim. Thus, there is no genuine dispute as to any material fact and Tesla is entitled to judgment as a matter of law as to the remaining counts alleged in Plaintiffs' Second Amended Complaint.

## FACTUAL BACKGROUND

### A.  *Plaintiffs' Second Amended Complaint ("SAC")*

Plaintiffs were granted leave to file a Second Amended Complaint, which was subsequently filed on July 30, 2021, that contains allegations of purported fraudulent or misleading statements made by Tesla;[7] however, an examination demonstrates the incredulous nature of these allegations.

Plaintiffs begin the SAC by stating that "Tesla publicly touts the Model X as 'the **safest**, quickest, and most capable sport utility vehicle in history.' In fact, Tesla proclaims the Model X to be 'the safest SUV ever.'" (Second Amended Compl., Dkt. 71 ("SAC") ¶ 6) (emphasis in original, citing to Tesla's website from March 26, 2020). Plaintiffs further allege that "[a]ccording to Tesla, the Model X's Autopilot technology provides a stress-free driving experience with

---

[7] Plaintiffs attempted to file a second amended complaint in an effort to certify a class action against Tesla in this matter based on the overall allegations that the Autopilot suite of features on Tesla vehicles generally was defectively designed and was unreasonably dangerous. However, this Court denied Plaintiffs' attempted class certification when it found the potential class was not adequately defined and not similarly situated. However, this Court permitted Plaintiffs to amend to include a single allegation that they were assigned the subrogation rights of their own loss by Progressive Insurance Company.

advanced safety and convenience features designed to assist you with the burdensome parts of driving...[and] [i]n fact, Tesla's CEO, Elon Musk, has declared that Autopilot was 'probably better than humans at this point in highway driving.'" (SAC ¶¶ 8-9).

However, Plaintiffs claim these statements were somehow misleading because of a purported design defect: "…Tesla does not disclose that in those circumstances, like freeway driving in dense traffic, Autopilot sometimes does not work, because at times, Autopilot simply does not recognize other cars and roadway hazards." (SAC ¶ 9). Plaintiffs further allege that "…Autopilot malfunctions for a variety of reasons, including the intermittent failure to recognize a roadway hazard, a roadway interpretation, or a novel traffic pattern. Sometimes, Autopilot just malfunctions without warning." (SAC ¶ 10). Undermining their own claim, Plaintiffs then admit and explain that Tesla refers to Autopilot "…as being in a 'beta-testing phase'…[which] was used to make sure Tesla drivers do not get too comfortable with its autopilot system." (SAC ¶ 14). Finally, they baselessly assert that Autopilot requires affirmative training by Tesla beyond the detailed information within the publicly available and on-board Owner's Manual. (SAC ¶ 17).

### B. *Plaintiffs' Purchase of the Subject Vehicle*

Plaintiffs' SAC contains allegations that Plaintiff Chan placed an online order for the Subject Vehicle sometime in 2015 and took delivery in September 2016, placing the Subject Vehicle in his wife's name. (SAC ¶¶ 28-30). Plaintiff Chan allegedly made frequent visits to Tesla's website to educate himself about Tesla's vehicles and technology, including Autopilot, prior to placing an order for the Subject Vehicle. (SAC ¶¶ 23, 24, 25, 28). Plaintiff Chan testified that he would access Tesla's website "…at least like one or two times a week because I want to check the status of, you know, my delivery…so I check it out every one or two times a week, you know, to see my delivery status." (Exhibit B, Deposition Trans. of Plaintiff Chan at 69: 16-25; 70: 1). Plaintiff Chan also allegedly visited Tesla's Syosset and Manhasset showrooms, where he test

drove a Tesla Model S and Model X. (SAC ¶¶ 25, 28). In fact, Plaintiff Chan admits he drove with Autopilot on during his test drive of the Subject Vehicle. (SAC ¶ 30, 31).

Plaintiff Chan contends that during each of these showroom visits, he spoke with unnamed and unidentified Tesla employees and explained he was interested in Autopilot given his daily commute in dense traffic on the Long Island Expressway. (SAC ¶¶ 26, 29). Plaintiffs claim that, during the first test drive, these unnamed and unidentified Tesla employees failed to "warn" Plaintiff Chan "that sometimes and under certain circumstances, the Tesla Autopilot feature is unreliable." (SAC ¶ 27). Plaintiff Chan also contends that during the second test drive, a Tesla employee only identified as "Megan" "made a big deal about Tesla's Autopilot feature" and "provided no warnings or caveats about Autopilot's performance in highway traffic…." (SAC ¶¶ 29, 30). Plaintiffs further allege that when Plaintiff Chan took delivery of the Subject Vehicle at Tesla's Brooklyn store in September 2016, employees at that location did not provide specific training about Autopilot, did not provide Plaintiff Chan with materials about Autopilot or "warn" him that Autopilot could be "inactive or unreliable in certain circumstances." (SAC ¶¶ 33, 34, 52).

Plaintiff Wang confirmed at her deposition that the Subject Vehicle was titled in her name despite the fact that it was her husband's idea to purchase the vehicle. (Exhibit C, Deposition Trans. of Plaintiff Wang at 15: 5-25). She was unaware why Plaintiff Chan wanted to purchase the vehicle and had no personal interest in purchasing the vehicle individually. (*Id.*). Plaintiff Wang further testified that at the second test drive of the vehicle that the "sales lady" was seated in the rear passenger seat of the vehicle during the test drive; however, she could not recall any specific conversations between the "sales lady" and Plaintiff Chan. (*Id.* at 18: 18-25).

### C.    *Tesla's Owner's Manual*

Plaintiffs' SAC references portions of the owner's manual—also accessible through the vehicle's electronic center touchscreen— related to Autopilot, but Plaintiffs failed to include

reference to any of the numerous and clear instructions, notes and warnings about proper use of Autopilot , the responsibilities of the driver while Autopilot is activated and certain clearly disclosed limitations of the technology. (SAC ¶ 8). For example, Plaintiffs omit Tesla's disclosure of various limitations of these features and how Tesla specifically warns drivers: "Never depend on these components to keep you safe. It is the driver's responsibility to stay alert, drive safely, and be in control of the vehicle at all times." (See Exhibit D, Tesla Model X Owner's Manual). This is merely one example of numerous statements in the owner's manual that warn and remind a driver of their "responsibility to stay alert, drive safely, and be in control of the vehicle at all times," as well as statements that disclose limitations of the technology.   Plaintiffs do not deny having received the manual, only that they did not receive a physical copy of it.  (SAC ¶ 35). And, Plaintiffs' only acknowledgment of these warnings relating to driver responsibility and Autopilot's system limitations is found under Plaintiffs' discussion of "Tesla's Excuses." (SAC ¶¶ 49-51).

### D. *The Accident*

Plaintiff Chan had traveled Eastbound on the Long Island Expressway near 185 many times before the incident. (*Id.* at 113:8-15). Plaintiff Chan had just merged "from the surface" or the merging lane and was in the first lane of travel on the right-hand side of the road. (*Id.* at 115:7-15). In fact, he observed a yellow traffic sign signaling that traffic would be merging from the right onto the expressway that would have alerted him to this fact. (*Id.* at 117:1-7). Plaintiff Chan agreed that, as a driver in rush hour traffic on the Long Island Expressway, it is important for a driver to pay attention because other drivers are sometimes changing lanes, sometimes stopping quickly. (*Id.* at 119:25, 120:1-5).

Plaintiff Chan had TACC and Autosteer activated just before the incident occurred. (*Id.* at 125:11-14). He could not recall whether he was travelling less than 5 miles per hour just before the incident. (*Id.* at 125:15-22). Plaintiff Chan had a dashboard video camera that was recording

the entire incident. (*Id.* at 127:8-10). He added the dashboard video camera and it was not originally equipped on the Subject Vehicle. (*Id.* at 127:11-23). Plaintiff Chan believes the dash cam is "important while you driving because…if somebody break in the car or sometime accidents, you know, you have something to prove that, you know, who's – you know, it's evidence…" (*Id.* at 128:1-6). He agreed that the below image demonstrates the white Audi SUV merging into the right-hand lane in front of the Subject Vehicle and behind a tractor-trailer. (*Id.* at 129).



He agreed "there's enough space" for the white Audi to merge into his lane of travel at this time. (*Id.* at 130:7-10).

Plaintiff Chan could have stopped or slowed the Subject Vehicle by pressing the brake pedal but he did not do so "because the car stop by itself at this point." (*Id.* at 131:7-14). He "only turned the steering [wheel] when the Tesla suddenly moved forward and I feel that – the Tesla have no reason to move forward because it just getting too close to the car and it seems to me that the Tesla did not see the Audi…" (*Id.* at 131:15-25, 132:1-2). In further explaining his actions, Plaintiff Chan testified, "…it's a natural reaction that I turn the wheel to the left and try to avoid

hitting the Audi, and that's the first time I turn my steering wheel, after the Audi merge…in front of me." (*Id.* at 132:1-8). He firmly believes "I press on the brake" and not the accelerator pedal when he moved his steering wheel to the left. (*Id.* at 132:9-11). Plaintiff Chan maintained this position after he hit two other motor vehicles: "…then after hitting the second car…I just bounced back to the seat, so my foot released on the brake. I did not press on the brake anymore…and then after this, I reapplied the brake and this time the brake works, so the car come to a full stop after the second impact." (*Id.* at 133:18-25, 134:1-2).

He frequently traveled the Long Island Expressway in the Subject Vehicle with Autopilot engaged. (*Id.* at 137:11-20). He had no problems with Autopilot functioning in any of his prior trips on the Long Island Expressway in either direction. (*Id.* at 137:22-25, 138:1-2). He was advised prior to the incident by reading the owner's manual through the touchscreen in the Subject Vehicle that he needed to be maintaining awareness and ready to take control of the Subject Vehicle at any time. (*Id.* at 140:2-8). On the date of the incident, December 13, 2017, it was Chan's understanding that as a licensed driver he was responsible for maintaining a reasonably safe rate of speed as a driver. (*Id.* at 108:14-19). He also understood that he had a legal obligation to maintain control of the Subject Vehicle at all times. (*Id.* at 109:7-10). He knew he had a legal obligation to use reasonable care to avoid colliding with another vehicle. (*Id.* at 109:11-22).

## E.    *Expert Analysis by the Parties*

Plaintiffs disclosed three purported experts in this case in the areas of accident reconstruction (Mr. Daniel Desautels), human factors (Dr. Jason Droll), and motor vehicle valuation (Mr. John "Jack" Donachie).[8] Tesla disclosed two experts for this matter in the area of

---

[8] Tesla has simultaneously filed three Motions to Strike Mr. Desautels, Dr. Droll, and Mr. Donachie under FRE 702 for lack of qualification, unreliable scientific theory, and irrelevance. If any of the FRE 702 Motions are granted by the Court, it necessarily establishes that Plaintiffs cannot maintain any of their causes of action against Tesla.

accident reconstruction (Mr. James Walker) and human factors (Dr. David Cades). The expert opinions and analysis are irrelevant to Tesla's Motion for Summary Judgment under Rule 56 and Tesla's objections to Plaintiffs' experts are outlined in separate Motions to Strike. Thus, Tesla will not address the reports and testimony of the respective experts in this Motion.

### F.    *The Assignment of Benefits*

Plaintiff Chan testified, "I report the accident and since I have full coverage, so, you know, the insurance company, you know, pay for my damage." (Exhibit B at 21:14-16). Plaintiff Chan confirmed later that "They paid my claim in full, yes." (*Id.* at 25:20-25, 26:1). Specifically, "they told me the car is like…it's like a total loss, you know, so they give me just the residual value of the car…I think around $100,000" (*Id.* at 26:9-14). Plaintiff Chan was able to immediately lease a 2018 or 2019 BMW X3 after being paid by Progressive for the Subject Vehicle. (*Id.* at 47:1-11).

Plaintiffs' First Amended Complaint, filed August 31, 2020, made no mention of any assignment of benefits. (Dkt. 18, Plaintiffs' First Amended Complaint). Plaintiff Chan's deposition was taken on November 30, 2020; thus, Tesla was unaware of any assignment of benefits and indeed at that point no assignment had been executed. (Exhibit B). However, Plaintiffs' Second Amended Complaint alleges (after payment was made on the claim to Plaintiffs) that "Plaintiffs' insurer absolutely and irrevocably assigned and transferred to Plaintiffs its right of subrogation related to the claim, thereby authorizing Plaintiffs to pursue those rights along with any other rights, claims, causes of action, or interests the insurer may have in connection with the claim or the collision, and to recover all proceeds that may be obtained." (ECF No. 71 at ¶ 44, pg. 12).

Curiously, this "Assignment of Subrogation Rights and Proceeds" was "executed" on December 15, 2020 by Mr. Michael Tyminski of Progressive Northeast Insurance Company. (Exhibit E, Assignment of Subrogation Rights and Proceeds). The "Assignment" states "ASSIGNOR UNDERSTANDS THAT IT IS EXPRESSLY ASSIGNING ITS RIGHT OF

SUBROGATION FOR THE FULL AMOUNT PAID IN SETTLEMENT OF ITS CLAIM NUMBER 17-1468387, AND ANY OTHER AMOUNTS RELATED THERETO." (*Id.*). Notably, there is no statement of consideration or mention of consideration for the Assignment and it is not signed by Plaintiffs. (*Id.*). Thus, the Assignment lacks validity on its face.

## ARGUMENT

### A.    Rule 56 Legal Standard

Summary judgment under FED. R. CIV. P. 56 is warranted if Plaintiffs cannot make a showing sufficient to establish each element for which they bear the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Although the Court will view facts and inferences in the light most favorable to Plaintiffs, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986), Plaintiffs must nonetheless offer some "concrete evidence from which a reasonable juror could return a verdict in [their] favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 243, 256 (1986). Concrete evidence requires more than a mere "scintilla" of evidence, *id.* at 252, and Plaintiffs cannot avoid summary judgment simply by introducing conclusory allegations or speculation. *See*, *Scottxo v. Almenas*, 143 F.3d 105, 114 (2nd Cir. 1998).

### B.    Plaintiffs' Alleged Design Defect Cannot Establish a Breach of Express Warranty

Plaintiffs' Breach of Express Warranty claim fails as a matter of law. These "express warranties", as alleged in Plaintiffs' SAC, are that Tesla represents "…the Model X as a safe, technologically sophisticated vehicle that is opening the door to fully self-driving vehicles of the future…[and] the Tesla Model X's Enhanced Autopilot features as being capable of assisting users with the 'burdensome parts of driving'…" (SAC ¶¶ 6-9). The "express warranties" Plaintiffs point to are statements taken from a version of Tesla's website available four years *after* the sale of the Subject Vehicle that contain statements about safety and the *potential* for fully self-driving

vehicles at some point in the future. Plaintiff Chan readily agrees he knew the car was not self-driving and that his purchase of Autopilot did not make it so. Further, Plaintiffs' SAC only alleges *design* defects in the Subject Vehicle's Autopilot feature by incorrectly claiming it "simply does not work" as the purported breach of the alleged "express warranties"; however, as a matter of law, express warranties only cover defects in materials or workmanship, not design defects. Plaintiffs' expert Mr. Desautels claims to be a "mechanical systems" expert so, if anyone, he would be the one for Plaintiffs to say and prove there was a defect in the materials or workmanship – some mechanical system – that was unique to the Subject Vehicle and not borne of an alleged design defect, and he does neither. Therefore, even if Plaintiffs can somehow demonstrate that the representations of the Model X on Tesla's website (in 2020, years after the product was sold to Plaintiffs) are "express warranties", Plaintiffs will be unable to recover as a matter of law where they allege only design defects as the purported breach of the express warranties.

The creation of an express warranty as a matter of law can be succinctly explained as follows: "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." *Avola v. La.-Pac. Corp.*, No. 11–CV–4053 (PKC), 2013 WL 4647535, at *6 (E.D.N.Y. Aug. 28, 2013) (quoting N.Y. U.C.C. § 2–313(1)(a)); *accord Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 604 (S.D.N.Y. 2010) (describing express warranty as affirmation of fact or promise naturally tending to induce buyer to purchase and upon which buyer relies to his detriment). A claim for breach of express warranty under New York law requires Plaintiffs to allege "(1) the existence of a material statement amounting to a warranty, (2) the buyer's reliance on this warranty as a basis for the contract with the immediate seller, (3) breach of the warranty, and (4) injury to the buyer caused

by the breach." *Avola*, 2013 WL 4647535, at *6 (citing *CBS Inc. v. Ziff–Davis Publ'g Co.*, 75 N.Y.

2d 496, 502–04, 554 N.Y.S. 2d 449, 553 N.E. 2d 997 (1990)); *accord Liberty Media Corp. v.*

*Vivendi Universal, S.A. (In re Vivendi Universal, S.A. Sec. Litig.)*, Nos. 02 Civ. 5571(RJH), 03

Civ. 2175(RJH), 2004 WL 876050, at *10 (S.D.N.Y. Apr. 21, 2004) (citing *Rogath v. Siebenmann*,

129 F.3d 261, 264 (2d Cir. 1997); *CBS Inc.,* 75 N.Y. 2d 496, 554 N.Y.S. 2d 449, 553 N.E. 2d 997)

(plaintiffs must allege "the existence of an express warranty, reliance on that warranty as part of

the agreement between the parties, and that the warranties were false or misleading when made,

proximately causing plaintiff's loss").[9] It remains true that, "…an express warranty 'may include

specific representations made by a manufacturer in its sales brochures or advertisements regarding

a product upon which a purchaser relies.'" *Arthur Glick Leasing, Inc. v. William J. Petzold, Inc.*,

51 A.D. 3d 1114, 1116, 858 N.Y.S. 2d 405 (3d Dep't 2008) (citing *Randy Knitwear, Inc. v. Am.*

*Cyanamid Co.*, 11 N.Y. 2d 5, 14, 226 N.Y.S. 2d 363, 181 N.E. 2d 399 (1962) (no privity

requirement where manufacturer made express representations to induce reliance by remote

purchasers)); *accord Daniels v. Forest River, Inc.*, No. 07–4227, 2013 WL 3713464, at *3 (Sup.

Ct. Suffolk Cnty. June 28, 2013). However, Plaintiffs must "set forth the terms of the warranty

upon which [they] relied." *Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467,

---

[9] Plaintiffs' SAC specifically references N.Y. U.C.C. § 2–313 which provides: "(1) Express warranties by the seller are created as follows: (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model. (2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 317 n.18 (S.D.N.Y. 2013).

482 (S.D.N.Y. 2014) (quoting *Parker v. Raymond Corp.*, 87 A.D. 3d 1115, 1117, 930 N.Y.S. 2d 27 (2d Dep't 2011)).[10]

Here, Plaintiffs allege only generic statements from Tesla's website in March 2020 about the overall safety of the Tesla Model X and the potential to unlock fully self-driving vehicles in the future as warranties. Plaintiffs further allege that the statement of a salesperson, Ms. Meghan Mack, during a test drive of a Model X that Plaintiff Chan could engage Autopilot in the High-Occupancy Vehicle (HOV) lane of the Long Island Expressway and close his eyes and relax constitutes an express warranty. Therefore, Plaintiffs would have this Court believe that the mere occurrence of this incident was a breach of these "express warranties."

However, "Courts in this Circuit have found that a warranty protecting 'defects in materials or workmanship' covers manufacturing defects but not design defects." *See Haag v. Hyundai Motor America*, 294 F. Supp. 3d 102, 105 (W.D.N.Y. 2018) ("It is well settled that where, as here, a warranty protects against defects in 'materials and workmanship,' the warranty covers manufacturing defects, but not design defects."); *Guariglia v. Procter & Gamble Co.*, 2:15-cv-04307 (ADS) (SIL) (E.D.N.Y. Mar. 14, 2018); *Koublani v. Cochlear Ltd.*, 2:20-cv-1741 (DRH) (AYS), at *27 (E.D.N.Y. June 23, 2021); *Miller v. Hyundai Motor Am.*, 15-CV-4722, 2017 WL 4382339, at *4 (S.D.N.Y. Sept. 29, 2017) ("A warranty that protects against defects in materials or workmanship covers manufacturing defects, but not design defects."); *Catalano v. BMW of North America, LLC*, 167 F. Supp. 3d 540, 544 (S.D.N.Y. 2016) (citing *Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212, 226-27 (S.D.N.Y. 2015)); *Grupo Sistemas Integrales de*

---

[10] Notably, to maintain a breach of warranty claim under the New York State New Car Lemon Law (N.Y. G.B.L. § 198-a) or under the federal Magnusson-Moss Warranty Act (15 U.S.C. ch. 50 § 2301 *et. seq.*), Plaintiffs must have brought the Subject Vehicle in for a requisite number of repairs before being able to file suit (i.e. four repair attempts under New York lemon law or a "reasonable number" of repair attempts under Magnusson-Moss). However, Plaintiffs ***never*** brought the Subject Vehicle to Tesla for ***any*** repairs relating to any Autopilot feature.

*Telecomunicacion S.A. de C.V. v. AT & T Commc'ns. Inc.*, 92-CV-7862, 1996 WL 312535, at *7 (S.D.N.Y. June 10, 1996) ("[I]n limiting its warranty to claims based on defective materials or workmanship, Article 5 excludes claims of *design* defect.") (emphasis in original).

Plaintiffs alleged "express warranties" (that Tesla will address assuming *arguendo* that they may constitute "express warranties" despite the inherent vagueness and ambiguity of the statements) are unequivocally allegations of a "design defect." To be clear, "[a] manufacturing defect is a mistake–an unintended deviation from normal or routine production that renders an ordinarily safe product dangerous," while design defects "'involve products made in the precise manner intended by the manufacturer,' which are unreasonably dangerous as designed." *Cummings v. FCA US LLC*, 401 F. Supp. 3d 288, 314 (N.D.N.Y. 2019) (citations omitted). Plaintiffs' SAC only alleges design defects with references to other (irrelevant) accidents where Autopilot was allegedly engaged and the (unsupported) allegations that Autopilot fails in slow, heavy traffic situations where vehicles are merging. Additionally, none of Plaintiffs' experts identified any manufacturing defect in the Subject Vehicle either as a matter of fact or opinion.

This matter is analogous to another attempted breach of express warranty action where the plaintiff alleged automotive design defects instead of manufacturing defects, *Cummings v. FCA US LLC*, 401 F. Supp. 3d 288 (N.D.N.Y. 2019). In *Cummings*, the plaintiff, "…made passing notations of a defect in material, manufacturing and/or workmanship (i.e., that one of the class questions is whether the transmission contains either type of defect, that the transmission was 'not adequately designed, manufactured, and/or tested,' that the vehicles were 'designed and manufactured in such a way as to present an inherent safety risk')"; however, "her overall Complaint suggests that she is really alleging a design defect (i.e., that the vehicle she purchased 'contained the defectively designed 9-Speed Transmission,' citing to design failure mode analysis

testing and fundamental design guidelines, and that the transmission is 'defectively designed and unsafe')." *Cummings*, 401 F. Supp. 3d at 314-15 (citations to the record omitted). Therefore, the Court in *Cummings* found that, "…Plaintiff's references to a defect in manufacturing or workmanship are conclusory and unsupported by any factual allegations, and that her Complaint overall suggests that she is alleging a design defect, the Court finds that the limited references to a defect in manufacturing or workmanship do not plausibly suggest that she was actually intending to allege a defect in manufacturing or workmanship." *Cummings*, 401 F. Supp. 3d at 314-15. In fact, the Court in *Cummings* noted that, "…where the plaintiff has asserted a defect on behalf of a putative class of persons who all purchased vehicles with the same alleged defect, such class action 'contradicts the nature of manufacturing defects, which, "by definition, are imperfections that inevitabl[y] occur in a typically small percentage of products,"' particularly where the plaintiff has failed to allege a flaw in the larger manufacturing process." *Cummings*, 401 F. Supp. 3d at 315 (citing *Miller*, 2017 WL 4382339, at *5).

Here, rather than alleging a manufacturing defect, Plaintiffs allege more generally that Autopilot was not adequately tested before implementation, that it fails in certain situations, and numerous other allegations about the design of the overall system. Plaintiffs make it explicit in their SAC, and verified the allegations in Plaintiff Chan's deposition, that the overall allegations against Tesla are that Autopilot would *always* fail in the situation Plaintiff Chan was presented with in the subject incident. Plaintiffs' testimony and SAC are devoid of reference to a defect in the manufacturing or workmanship of the Subject Vehicle. Instead, Plaintiffs generally allege that the Autopilot feature in *any* Tesla vehicle is somehow defective.[11] Clearly, Plaintiffs have alleged

---

[11] To illustrate this point, Plaintiffs sought leave of the Court to file a Second Amended Complaint to bring claims on behalf of a class or subclass of persons. (Dkt. 42, 42-1 ¶¶ 56, 66, 76, 89, 97, 105, 111, 124, 137). Magistrate Judge Sanket Bulsara denied Plaintiffs' motion to add class allegations "because the class claims are futile." (Dkt. 69 at 1).

a design defect and one of Plaintiffs' experts opined on issues pertaining to alleged design defects but not about any manufacturing defect. Thus, the purported warranties that the Tesla Model X was the "safest" or that Plaintiff Chan could drive in the HOV lane on the Long Island Expressway with his eyes closed do not relate to or involve manufacturing or workmanship defects; nor do Plaintiffs allege them to relate to or involve manufacturing or workmanship defects. Thus, the warranties do not cover the alleged *design* defects in Autopilot. For these reasons, Count I of Plaintiffs' SAC must be dismissed.

### C. Plaintiffs' Breach of Implied Warranties of Merchantability and Fitness for a Particular Purpose Similarly Cannot Be Established

Under New York law, "[c]auses of action for breach of implied warranties bear a strong resemblance to those for strict products liability." *Monell v. Scooter Store, Ltd.*, 895 F.Supp.2d 398, 416 (N.D.N.Y. 2012). Under a theory of breach of implied warranty of merchantability or breach of implied warranty of fitness for a particular purpose, the inquiry is focused on consumer expectations when the product "was being used for the purpose and in the manner intended." *Beneway v. Superwinch, Inc.*, 216 F.Supp.2d 24, 30 (N.D.N.Y. 2002) (citation omitted). "A product must be 'fit for the ordinary purposes for which such goods are used' to be considered merchantable under New York's version of the Uniform Commercial Code." *Derienzo v. Trek Bicycle Corp.*, 376 F.Supp.2d 537, 570 (S.D.N.Y.2005) (quotation and other citation omitted). A finding that a product liability claim and a breach of implied warranty claim are distinct "requires a showing that the 'ordinary purpose' for which the product was sold and marketed is **not the same** as the purpose that provides the utility that outweighs the risk of injury." *Gonzalez by Gonzalez v. Morflo Indust., Inc.*, 931 F.Supp. 159, 167 (E.D.N.Y. 1996) (quotation omitted, emphasis added). However, it remains possible that, "…the factfinder could simultaneously conclude that a product's utility outweighs the risk of injury and that the product was not safe for

the "ordinary purpose" for which it was marketed and sold. *Id.* (citing *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 263 (N.Y. 1995); *see also Donald v. Shinn Fu Co. of Am.*, 2002 WL 32068351, 99-CV-6397, *4 (E.D.N.Y. Sept. 4, 2002) (explaining that an implied warranty claim asks only whether the product was fit for its intended purpose, while the strict liability claim requires a risk-utility balancing test).

Plaintiffs' Breach of Implied Warranty of Merchantability claim is brought under N.Y. U.C.C. § 2-314. Under the UCC, if a seller is a merchant, there is an implied contract that the goods will be of merchantable quality. *See Denny*, 87 N.Y.2d 248 (citing section 2-314(2)(c) of the UCC). A warranty of merchantability, however, "does not mean that the product will fulfill a 'buyer's every expectation' but rather simply 'provides for a minimum level of quality.'" *Viscusi v. Proctor Gamble*, No. 05-CV-01528 (DLI) (LB), 2007 WL 2071546, at *13 (E.D.N.Y. July 16, 2007) (citing *Denny*, 87 N.Y.2d at 259). *See also Sugawara v. Pepsico, Inc.*, No. 2:08-cv-01335-MCE-JFM, 2009 WL 1439115, at *5 (E.D. Cal. 2009) (same) (citations omitted); *see generally* 18 Williston on Contracts § 52:76 (4th ed. 2009) (equating "merchantable" quality with "fitness for human use or consumption."); *see also Ackerman v. Coca-Cola Company*, CV-09-0395 (JG) (RML), at *52-53 (E.D.N.Y. July 21, 2010) ("Even crediting each of the allegations of the complaint, plaintiffs cannot establish that vitamin water failed to constitute a merchantable product."). Further, an implied warranty of fitness for a particular purpose claim arises "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." *Potler v. MCP Facilities Corp.*, 471 F. Supp. 1344, 1349 (E.D.N.Y. 1979).

Here, Plaintiffs allege the particular purpose to be "to ease the burden of his daily commute on the Long Island Expressway and other densely-trafficked roads…" (SAC at ¶ 74, pg. 16). There

is no evidence in this case that Autopilot failed to fulfill this alleged purpose. Plus, Plaintiff Chan admitted that he was well aware of the limitations of Autopilot and the warnings accompanying it that was meant to "ease the burden", not completely eliminate his need to maintain awareness and readiness to take control of the vehicle at all times. Plaintiff Chan had no problem with Autopilot's operation on the Long Island Expressway beforehand, even marveling at its capabilities during his test drive. The particular purpose of Autopilot is to function as described  - an advanced driver assistance systems (ADAS) and not as a fully autonomous vehicle. Quite simply, Plaintiffs cannot present any evidence to demonstrate that the Subject Vehicle failed to satisfy the task of getting them from Point A to Point B like intended when you purchase a vehicle or that Autopilot failed to ease the burden of his daily commute at any time. For these reasons, Counts II and III of the SAC must be dismissed.

> **D. Tesla Provided Warnings Plaintiff Chan was Well-Aware of During the Accident but Failed to Obey**

Count IV of the SAC contains allegations that Tesla breached a duty of care by failing to warn of known and foreseeable risks associated with the Model X, specifically about alleged "known and foreseeable risk that Autopilot would fail to function as represented in dense traffic, and…drivers would not be able to react in time to correct for such a failure." (SAC at ¶ 81).

Generally, under New York law, "[a] manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known." *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237, 677 N.Y.S.2d 764, 700 N.E.2d 303 (1998) (citing *Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289, 297, 591 N.E.2d 222, 582 N.Y.S.2d 373 (1992)). A plaintiff must show a breach of that duty and "that the failure to warn was the proximate cause of his [or her] injury." *Henry v. Rehab Plus Inc.*, 404 F.Supp.2d 435, 442 (E.D.N.Y. 2005) (citations omitted). Thus, to make out a *prima facie* case in negligence and strict liability, a plaintiff

asserting a failure to warn claim must establish that (1) the manufacturer had a duty to warn, *i.e.*, it knew or should have known of latent dangers resulting from intended or reasonably foreseeable unintended uses of the product; (2) the plaintiff used the product in a reasonably foreseeable manner; and (3) the manufacturer's failure to provide a warning was the cause of the plaintiff's harm. *See Santoro ex rel. Santoro v. Donnelly*, 340 F.Supp.2d 464, 485–86 (S.D.N.Y. 2004) (citation omitted); *see also Liriano,* 92 N.Y.2d at 237 (citations omitted). Further, "[a] defense to liability for failure to warn exists when the injured party had actual knowledge of the danger." *Henry v. Rehab Plus Inc.*, 404 F.Supp.2d 435, 442 (E.D.N.Y. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Plaintiffs not only allege the absence of a warning but also, in the alternative, allege any warning provided was inadequate. (SAC at ¶ 82). As the court explained in *Monell v. Scooter Store, Ltd.*, 895 F.Supp.2d 398, 413-14 (N.D.N.Y. 2012), there are circumstances where failure to warn claims can be decided as a matter of law: (1) "where the injured party was fully aware of the hazard through general knowledge, observation or common sense, or participated in the removal of the safety device whose purpose is obvious"; or (2) where the hazards are "patently dangerous or pose open and obvious risks." *Liriano I*, 92 N.Y.2d at 241.

In this case, Plaintiff Chan testified that he sat down and read the Owner's Manual that was available through the Subject Vehicle's touchscreen shortly after bringing the vehicle home. (Exhibit B at 91: 9-25; 92: 1-10). Specifically, he recalled reading the warning statements contained within the Owner's Manual at that time, well before the subject incident. (*Id.* at 95: 9-25). These warnings included that it was his responsibility as the driver of the Subject Vehicle to stay alert, drive safely, and be in control of the vehicle at all times. (*Id.* at 98: 9-20). Further, **he affirmed that he was never to depend on Traffic-Aware Cruise Control to adequately slow**

**down the Model X**. (*Id.* at 98: 9-20). Plaintiff Chan was acutely aware that the Owner's Manual explains **not to use Traffic-Aware Cruise Control on city streets or on roads where traffic conditions were constantly changing**. (*Id.* at 99: 24-25; 100: 1-4).[12]

He testified that these warnings in the Owner's Manual were viewed well in advance of the subject incident. *Id.* at 95: 22-25; 96: 1-8 (CHAN: ". . . but when I read this, I say, 'You know what? I still have to – you know - you know, I still have to be aware of the traffic situation, you know.'"). Further, Plaintiff Chan frequently traveled the Long Island Expressway in the Subject Vehicle with Autopilot engaged. (Exhibit B at 137:11-20). He had no problem with Autopilot functioning in any of his prior trips on the Long Island Expressway in either direction. (*Id.* at 137:22-25, 138:1-2). He was advised prior to the incident by reading the Owner's Manual through the touchscreen in the Subject Vehicle that he needed to maintain awareness and be ready to take control of the Subject Vehicle at any time. (*Id.* at 140:2-8). On the date of the incident, it was Plaintiff Chan's understanding that as the driver he was responsible for maintaining a reasonably safe rate of speed. (*Id.* at 108:14-19). He also understood that he had a legal obligation to maintain control of the Subject Vehicle at all times. (*Id.* at 109:7-10). He knew he had a legal obligation to use reasonable care to avoid colliding with another vehicle. (*Id.* at 109:11-22).

Thus, Plaintiff Chan undisputedly had actual knowledge of the purpose and limitations of Autopilot and his role as driver using Autopilot. He readily admits reading the numerous warnings in the Owner's Manual of the Subject Vehicle and Ms. Mack's explanations of the limitations of the Autopilot suite of features to not use it on city streets and to stay in the HOV lane while on the Long Island Expressway.

---

[12] Again, the Owner's Manual's warning closely aligns with the representation that Chan attributes to Ms. Mack, that he could drive the vehicle specifically in the high-occupancy vehicle lane (not the lane of constantly merging traffic) of the Long Island Expressway utilizing Autopilot, and her warning to not use it on side streets or in city driving.

Simply put, Plaintiffs have no evidence that a "failure to warn" or "inadequacy of the warning" caused the accident to occur. There is no evidence that the warnings admittedly provided and understood fully by Plaintiff Chan in the Subject Vehicle's Owner's Manual did not accurately describe to a lay person the importance of staying ready to assume complete control of the Subject Vehicle at all times. New York law is clear that "a manufacturer is not obligated to provide such warnings to a knowledgeable user who is already aware of the specific hazards that exist when the product is in use and which [allegedly] caused the accident." *Hall v. Husky Farm Equip., Ltd.*, 92 A.D.3d 1188, 1190-91 (N.Y. App. Div. 2012) (citations omitted).

Plaintiffs may argue that there was a failure to warn Plaintiff Chan that Autopilot may not detect another vehicle merging into his lane of travel. However, Plaintiff Chan appreciated and understood that he was to constantly observe the driving environment to assume control of the Subject Vehicle should a purported failure arise. In other words, he was "fully aware of the hazard through general knowledge" related to driving any vehicle on a public highway. Failing to be prepared to assume complete control of all driving tasks is similar to cases where the plaintiff failed to use a seatbelt in a moving motor home or the plaintiff who placed his hands near an unguarded blade. *See Narvaez v. Wadsworth*, 165 A.D.3d 407 (N.Y. Sup. Ct. 2018) (citing *Fisher v. Flanigan*, 89 A.D.3d 1398 (N.Y. Sup. Ct. 2011); and *Cwiklinksi v. Sears, Roebuck & Co., Inc.*, 70 AD3d 1477, 1478–79 (N.Y. Sup. Ct. 2010).

The "court may decide the question [of whether a risk is open and obvious] as a matter of law when only one conclusion may be drawn from the facts." *Frazer v. ITW Food Equip. Grp. LLC*, No. 11-CV-9699 (CS), at *12-13 (S.D.N.Y. Nov. 22, 2013) (citation to published authority omitted). This is true in this case. Before any collision occurred, Plaintiff Chan watched the white Audi Q5 begin to merge into his lane. In fact, Plaintiff Chan testified that he appreciated the open

and obvious danger presented in the situation by believing he pressed his foot on the brake pedal. However, the facts are undisputed that Plaintiff Chan negligently applied the accelerator pedal instead, completely overriding any of the Subject Vehicle's ADAS features.[13] There is no warning Tesla could have provided to prevent Plaintiff Chan from negligently operating the Subject Vehicle after he observed the open and obvious maneuver of the white Audi Q5. *See Frazer*, *supra*. ("A warning would have added little, if anything, to Plaintiff's appreciation of the danger"); *see also Pierre v. Hilton Rose Hall Resort & Spa*, 14 Civ. 3790 (VMS), at \*14-15 (E.D.N.Y. Sep. 12, 2016) (citing *Howard v. Poseidon Pools, Inc.*, 530 N.E.2d 1280, 1281, 72 N.Y.2d 972 (1988) (finding no causation when the plaintiff, with general knowledge of pools and common sense, dove into shallow end and was injured), and *Rogers v. Westfalia Associated Techs.*, 485 F.Supp.2d 121, 129 (N.D.N.Y. 2007) ("In both of these scenarios, the duty to warn is effectively vitiated by the factual circumstances.")).

Thus, Plaintiff Chan cannot meet the elements of a failure to warn claim where he (1) read and understood the warnings about the Autopilot suite of features, (2) observed an open and obvious risk and failed to react appropriately, and (3) Autopilot was not the cause of Plaintiff Chan's collisions where even his own experts agree he applied the accelerator pedal and created the dangerous situation through his own actions or inaction. For these reasons, Count IV of the SAC must be dismissed.

### E. Plaintiffs' Deceptive and Misleading Trade Practice and False Advertising Claims are Time Barred and Otherwise Fail as a Matter of Law

Count V of the SAC concerning purported deceptive and misleading business practices and false advertising must be dismissed with prejudice as Plaintiffs failed to satisfy the three-year

---

[13] As discussed in Tesla's Motion to Exclude Plaintiffs' expert Daniel Desautels, Mr. Desautels admitted that Plaintiff Chan caused the Subject Vehicle to accelerate into other vehicles because he had pedal misapplication – he pressed the accelerator pedal to 100% throttle instead of the brake pedal (Exhibit F – Portion of Desautels Dep., 156:12-14).

statute of limitations applicable under New York law. Furthermore, "puffery" would be a clear defense to Plaintiffs' claims as the alleged representations on Tesla's website (again, four years *after* the vehicle was sold to Plaintiffs) and the alleged representations of any salesperson (if they occurred at all – something Tesla denies) would clearly – as a matter of law – fall within the category of exaggerations or overstatement – expressed in broad, vague, and commendatory language – that make no claims Plaintiffs could rely upon as wholly subjective. Therefore, Plaintiffs' Count V must be dismissed with prejudice.

As a preliminary matter, Plaintiffs' claims under New York General Business Law ("N.Y. G.B.L.") §§ 349 and 350 are barred by the applicable three-year statute of limitations under N.Y. C.P.L.R. § 214(2). It is axiomatic that accrual of a claim under either N.Y. G.B.L. §§ 349 or 350 "is not dependent upon any date when discovery of the alleged deceptive practice is said to occur." *Marshall v. American*, 51 F. Supp. 3d 451, 461 (S.D.N.Y. 2014) (citing *Statler v. Dell, Inc.*, 841 F. Supp. 2d 642, 648 (E.D.N.Y. 2012) ("*Statler II*") (J. Wexler)). Plaintiffs allege, and confirm through Plaintiff Chan's testimony, that the Autopilot suite of features were installed in the Subject Vehicle at the time Plaintiff Chan took delivery of the vehicle in September 2016. Therefore, the "injury" to Plaintiffs (i.e., the purchase of the Subject Vehicle) occurred more than three years prior to the filing of this action in June 2020. *See, e.g.*, *Marshall v. American*, 51 F. Supp. 3d 451, 461 (S.D.N.Y. 2014); *Statler II*, 841 F. Supp. 2d at 648 (E.D.N.Y. 2012); *Statler v. Dell, Inc.*, 775 F. Supp. 2d 474, 484 (E.D.N.Y. 2011) (holding the plaintiff's section 349 claim to be time-barred because "accrual occurs when [p]laintiff first suffered injury" and "the allegedly faulty capacitors were present in the computers purchased at the time of delivery") ("*Statler I*"); *M & T Mortgage Corp. v. Miller*, No. 02–CV–5410, 2009 WL 3806691, at *2 (E.D.N.Y. Nov. 13, 2009) (holding

that since the "plaintiffs' injuries occurred no later than the day on which they closed," that "more than three years elapsed after the date on which plaintiffs were injured ... before they filed suit").

To be clear, and in anticipation of such counterargument, Plaintiffs cannot claim that their "injury" occurred only when Autopilot allegedly "malfunctioned" in the incident on December 13, 2017 or when their insurance company paid for the resulting repairs. See, *Marshall*, 51 F. Supp. 3d at 461-62 (citing *Statler I*, 775 F. Supp. 2d at 484 ("Accrual is not dependent upon any date when discovery of the alleged deceptive practice is said to occur."); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, Nos. 4–CV–2389, 04–CV–3417, 04–CV–5424, 2007 WL 1601491, at \*14 (S.D.N.Y. June 4, 2007) ("No discovery rule is applicable to section 349 claims."), *on reconsideration sub nom.*, 2007 WL 2936214 (S.D.N.Y. Oct. 4, 2007); *Wender v. Gilberg Agency*, 276 A.D. 2d 311, 716 N.Y.S. 2d 40, 41–42 (2000) (noting that "the date of discovery rule is not applicable [to § 349 claims] and cannot serve to extend [the three-year] limitations period")). Thus, as there is no genuine issue of material fact and Tesla is entitled to judgment as a matter of law, Plaintiffs' Count 5 for purported deceptive and misleading business practices and false advertising must be dismissed and no further analysis is necessary.

But even if Plaintiffs' N.Y. G.B.L. §§ 349 and 350 claims somehow survived the statute of limitations restriction, Plaintiffs' claims are still devoid of legal merit. N.Y. G.B.L. § 349(a) prohibits, "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in th[e] state." The requisite elements of such a claim are: "(1) that the defendant's acts were consumer oriented, (2) that the acts or practices are 'deceptive or misleading in a material way,' and (3) that the plaintiff has been injured as a result." *Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 478 (S.D.N.Y. 2014) (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y. 2d 20, 25, 623 N.Y.S.

2d 529, 647 N.E. 2d 741 (1995); *accord Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009); *City of New York v. Smokes–Spirits.Com, Inc.*, 12 N.Y. 3d 616, 621, 883 N.Y.S. 2d 772, 911 N.E. 2d 834 (2009); *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y. 2d 314, 324, 774 N.E. 2d 1190 (2002).

The New York Court of Appeals has "…established an objective standard for determining whether acts or practices are materially deceptive or misleading 'to a reasonable consumer acting reasonably under the circumstances.'" *Goldemberg*, 8 F. Supp. 3d at 478 (citing *Oswego*, 85 N.Y. 2d at 26, 623 N.Y.S. 2d 529, 647 N.E. 2d 741). Furthermore, "[a] court may make this determination as a matter of law." *Id.* at 478*; accord Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013), *aff'g* 837 F. Supp. 2d 279 (S.D.N.Y. 2011). To the extent Plaintiffs attempt to argue that their alleged "injury" was the purchase of the Model X as opposed to not purchasing a vehicle at all based upon allegedly deceptive trade practices, the New York Court of Appeals has rejected that theory. *Small v. Lorillard Tobacco Co.*, 94 N.Y. 2d 43, 56, 698 N.Y.S. 2d 615, 720 N.E. 2d 892 (1999); *see also*, *Preira v. Bancorp Bank*, 885 F. Supp. 2d 672, 676 (S.D.N.Y. 2012); *Baron v. Pfizer, Inc.*, 42 A.D. 3d 627, 629, 840 N.Y.S. 2d 445 (3d Dep't 2007).

And even if Plaintiffs' claims could overcome these numerous deficiencies, statements that are mere puffery cannot support a claim under N.Y. G.B.L. §§ 349 or 350, and thus "[c]ourts can determine that a statement is puffery as a matter of law." *Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 241 (S.D.N.Y. 2020) (citation omitted). "Puffery" has been described by courts as "an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Kacocha v. Nestle Purina Petcare Co.*, No. 15-CV-5489 (KMK), 2016 WL 4367991, at *16 (S.D.N.Y. Aug. 11, 2016) (quoting *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993)); *see also, Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007). These exaggerated statements are nor actionable as a matter of law because they "make no specific

claims on which consumers could rely," *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 528 n.14 (S.D.N.Y. 2003); they are "[s]ubjective claims about products, which cannot be proven either true or false." *Time Warner Cable*, 497 F.3d at 159 (alteration in original) (quoting *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995)); *see also*, *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346-47 (S.D.N.Y. 2020).

Here, Plaintiffs' allegations, even if viewed as true for the purposes of this motion, amount to nothing more than puffery – which he only read *after* they purchased the Subject Vehicle. Plaintiffs cite Tesla's website from March 26, 2020 (presented over 4 years *after* Plaintiffs took delivery of the Subject Vehicle) regarding the overall safety of the Subject Vehicle. (SAC ¶ 6) (citing Tesla's website from March 26, 2020). Plaintiffs highlight the representation that Autopilot is "designed to assist you with the burdensome parts of driving" and CEO Elon Musk's statement that Autopilot was "probably better than humans at this point in highway driving." (SAC ¶ 8-9). There is no manner in which Plaintiffs could conceivably prove either statement to be false.

Incredulously, Plaintiffs allege that "…Autopilot malfunctions for a variety of reasons, including the intermittent failure to recognize a roadway hazard, a roadway interpretation, or a novel traffic pattern. Sometimes, Autopilot just malfunctions without warning." (SAC ¶ 8-9). Plaintiffs, again without proof of this occurring in other instances, state that "Tesla's sales representatives routinely misrepresent and overstate the capabilities of Autopilot and the required level of operator involvement, promising that the customer can simply 'relax' while relying on Autopilot in the most stressful of driving conditions." (SAC ¶¶ 17, 29, 52).

In total, the statements Plaintiffs point to as allegedly misleading, false, or deceptive are – at their worst – non-actionable puffery. These statements use inherently subjective language (for example, the term "safe" which can be interpreted variously by consumers) that constitutes

exaggerations or overstatements expressed in broad, vague, and commendatory language. *Kacocha*, 2016 WL 4367991, at *16 (quoting *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993)); *see also, Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007). These statements "make no specific claims on which consumers could rely" because they are "[s]ubjective claims about products, which cannot be proven either true or false." *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 528 n.14 (S.D.N.Y. 2003), *cf Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 347 (S.D.N.Y. 2020) (listing examples of statements not considered mere puffing but instead were objective statements of fact that could be proven true or false).

Statements that Autopilot can relieve the "burdensome parts of driving" or Plaintiffs' allegation that Mr. Chan was told he could "close his eyes in the HOV lane" (in the extraordinarily unlikely event such a statement was made by Tesla employees at all) are simply puffing statements. No reasonable consumer in Plaintiff Chan's perspective could interpret an (alleged) comment from a salesperson that a driver could "close his eyes in the HOV lane" as anything other than hyperbole and puffing. And Plaintiff Chan was no different.

Indeed, Mr. Chan has admitted that *he* understood he remained responsible for driving and had to be prepared to take over at any time. The alleged statement (if actually made) is a statement made with commendatory language intended to convey a message that Autopilot can be trusted for what it is—a *driver assist* feature; however, the statement does not defeat: (1) the numerous clear notes, warnings and disclosures in the Owner's Manual that Plaintiff Chan testified he read; (2) on Tesla's website that Plaintiff Chan admittedly read and comprehended before operating the vehicle that unequivocally state that the driver must remain alert, attentive, and ready to take control of the vehicle with Autopilot engaged at all times; and (3) New York law requiring driver's

to have a hand on the wheel and maintain control of their vehicles.[14] Additionally, Plaintiff Chan was not operating his vehicle in the HOV lane at the time of the subject accident, he was in dense traffic with vehicles slowly merging into his lane (the far-right lane) that mimics city driving where the salesperson did not recommend using Autopilot. Thus, the alleged statements by Tesla are not only inapplicable to the specific driving situation encountered by Plaintiff Chan at the time of the accident, but if made were nothing more than non-actionable puffing statements of exaggeration or hyperbole that emphasize the Autopilot features and Plaintiffs' Count V must be dismissed as a matter of law. For these reasons, Count V of the SAC must be dismissed.

**F. Plaintiffs Cannot Demonstrate a Negligent Misrepresentation Claim in a Typical Consumer Arms-Length Transaction**

Finally, Count VII contains allegations that the very same statements discussed above constitute negligent misrepresentations. Count VII should also be dismissed. Plaintiffs have no evidence to demonstrate that their purchase of the Subject Vehicle, and the circumstances surrounding same, were anything more than a typical consumer purchase of a product. Plaintiff Chan admits that he understood the Autopilot functionalities/limitations and performed research of same, even test driving the Subject Vehicle and using the Autopilot functions that worked "perfectly", and read the Owner's Manual contained within the touchscreen display on the vehicle outlining in detail how to use Autopilot and the limitations of same. Plaintiffs present no proof demonstrating how the sale of a Tesla, as opposed to any other vehicle, creates a special relationship where Tesla somehow possesses unique or specialized experience (which is typically seen in the context of a fiduciary such as a financial advisor) that would require affirmative steps

---

[14] NY Veh & Traf L § 1226 (2014) - Control of steering mechanism. No person shall operate a motor vehicle without having at least one hand or, in the case of a physically handicapped person, at least one prosthetic device or aid on the steering mechanism at all times when the motor vehicle is in motion.

by Tesla when selling the vehicle to train its customers. This Court has already held that the parties engaged in an "arm's-length transaction" and Plaintiffs failed to "affirmatively disclose 'special facts' that were known to Tesla and unknowable by Plaintiffs." (Dkt. 68 July 16, 2021 Memorandum and Order re Tesla's Motion to Dismiss Count 6 under FED. R. CIV. P. 12(b)(6), at 9). As such, Plaintiffs cannot establish a special relationship required to prove a negligent misrepresentation claim, thus, Count VII must be dismissed with prejudice.

A negligent misrepresentation claim requires pleading the following elements: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012). One of the most imperative requirements is that a "special relationship" exists which occurs if, "…the defendant 'possess[es] unique or special expertise' or is 'in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'" *Sarr v. BEF Foods, Inc.*, No. 18 Civ. 6409 (ARR), 2020 WL 729883, at *6 (E.D.N.Y. Feb. 13, 2020) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y. 3d 173, 180 (2011)). The Second Circuit has further explained that "where the statement at issue is directed at a 'faceless or unresolved class of persons,' no duty of care arises." *Aetna Cas. and Sur. v. Aniero Concrete*, 404 F.3d 566, 584 (2d Cir. 2005) (quoting *White v. Guarente*, 43 N.Y. 2d 356, 361 (1977)). "This requirement carries extra weight '[i]n the commercial context,' where 'a closer degree of trust between the parties than that of the ordinary buyer and seller is required.'" *Stoltz v. Fage Dairy Processing Indus., S.A.*, 14 Civ. 3826 (MKB), 2015 WL 5579872,

at *24 (E.D.N.Y. Sept. 22, 2015); *see also Colpitts v. Growers*, 20 Civ. 2487 (JPC), at *28 (S.D.N.Y. Mar. 16, 2021); *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 188 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Kimmell v. Schaefer*, 89 N.Y. 2d 257, 264, 652 N.Y.S. 2d 715, 675 N.E. 2d 450 (1996)); *see also Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003) ("[T]he law of negligent misrepresentation requires a closer degree of trust between the parties than that of the ordinary buyer and seller in order to find reliance on such statements justified."); *Landesbank Baden–Wurttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 623–34 (S.D.N.Y. 2011) ("To state a claim for negligent misrepresentation in connection with a commercial transaction, a plaintiff must plead justifiable reliance."). Further, if "a plaintiff fails to allege the existence of a special relationship or the relationship is only 'sparsely pled,' the plaintiff must 'emphatically allege…the other two factors enunciated in *Kimmell* — whether the person making the representation held or appeared to hold unique or special expertise' and 'whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.'" *Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38, 75 (E.D.N.Y. 2017) (citations omitted).

The sales transaction here is analogous to a typical transaction as occurred in *Colpitts v. Growers*, 20 Civ. 2487 (JPC), at *28-29 (S.D.N.Y. Mar. 16, 2021). In *Colpitts*, the plaintiff stated that the defendant held "itself out as having special knowledge and experience" in the sale of the product at issue and a breach occurred when the defendant allegedly misrepresented the product's attributes. *Id.* at *28. The Court relied on longstanding case law for the proposition that "[t]he status of a retailer as a 'trusted brand…does not give rise to a duty to impart correct information, as the plaintiffs comprise a "faceless o[r] unresolved class" of consumers.'" *Sarr*, 2020 WL 729883, at *6 (quoting *Aetna Cas. & Sur. Co.*, 404 F.3d at 584) (alteration in original); *accord*

*Bautista v. CytoSport, Inc.*, 223 F. Supp. 3d 182, 193 (S.D.N.Y. 2016). Thus, the *Colpitts* court found that the mere allegations that the defendant held out to the public that it had special knowledge and experience fell short of establishing a special relationship. *Colpitts*, 20 Civ. 2487 (JPC), at *28-29. The complaint in *Colpitts* described, "…nothing more than a common relationship 'which is that of an ordinary buyer and seller.'" *Id.* at *28-29 (citation omitted).

Here, Plaintiffs allege that Tesla failed to disclose a design defect in the Autopilot software or affirmatively train Plaintiffs on how to operate Autopilot. Plaintiffs make no allegation that Tesla somehow had a "special relationship" with Plaintiffs; therefore, Plaintiffs must "emphatically" allege "'whether the person making the representation held or appeared to hold unique or special expertise' and 'whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.'" *Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38, 75 (E.D.N.Y. 2017) (citations omitted). Plaintiffs here made no such allegations and they lack any facts that would support such allegations had they been made. Instead, Plaintiffs allege that Tesla generally (rather than a specific person) held "special knowledge" about Autopilot that it failed to disclose to Plaintiffs. However, Plaintiffs do not allege or explain what specific information would have been useful for Plaintiffs to know prior to using Autopilot that they could not have learned from the Owner's Manual. Further, Plaintiff Chan, the only driver of the Subject Vehicle, admits that he read the Owner's Manual and understood the Manual's numerous warnings to remain attentive while operating the Subject Vehicle with Autopilot engaged.

Finally, Plaintiffs would have this Court require Tesla and, by logical extension, any other motor vehicle manufacturer selling ADAS like Autopilot, to affirmatively train every single customer how to operate Autopilot. No such duty exists under New York law. Plaintiffs have no evidence to support a negligent misrepresentation claim where they participated in a typical arms-

length purchase of a motor vehicle that has a feature present in numerous automobiles in its class. Thus, Plaintiffs' negligent misrepresentation claims must be dismissed with prejudice.

### G.    Plaintiffs' Assignment of Rights is Invalid and Plaintiffs Suffered No Damages

Plaintiff Chan does not allege to have suffered any personal injuries that he sought treatment for as a result of the subject accident. (Exhibit B at 29: 3-24). Plaintiffs only claim for damages lies in the alleged "loss" of personal property – i.e., the Subject Vehicle. However, Plaintiffs were compensated for the loss by their insurance company, Progressive, for about $100,000.00. (*Id.* at 155:7-19). Plaintiffs' only claim to entitlement for economic damages lies in the allegation that they received an assignment of the right to subrogate from Progressive. (SAC at ¶ 44). Thus, an examination of the purported assignments validity is necessary.

"A valid contract under New York law requires the familiar elements of offer, acceptance, consideration, mutual assent, and an intent to be bound." *Stone v. Sutton View Capital*, *LLC*, No. 17 Civ. 1574 (VEC), 2017 WL 6311692, at *4 n.7 (S.D.N.Y. Dec. 8, 2017) (citing *Register.com*, *Inc. v. Verio*, *Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)). Consideration requires more than a simple cash exchange: it requires "either a benefit to the promisor or a detriment to the promisee." *Weiner v. McGraw-Hill*, *Inc.*, 57 N.Y.2d 458, 464 (1982). "The promise and the consideration must purport to be the motive each for the other, in whole or at least in part. It is not enough that the promise induces the detriment or that the detriment induces the promise if the other half is wanting." *Allegheny Coll. v. Nat'l Chautauqua Cty. Bank of Jamestown*, 246 N.Y. 369, 373 (1927) (citation omitted). Further, the general rule in New York is that "[a] promise supported by past consideration is unenforceable because the detriment did not induce the promise." (quoting *Citibank*, *Nat'l Ass'n v. London*, 526 F. Supp. 793, 803 (S.D. Tex. 1981) (construing N.Y. law)).

The purported assignment blankly states that the assignment was made "for good and valuable consideration received" but fails to describe it with any particularly. (Exhibit E).

Progressive simply assigns the alleged subrogation rights to Plaintiff's for this accident and Plaintiffs make no promise or suffer any detriment. In fact, the result is the ability for Plaintiffs to recover twice for the value of the Subject Value. This matter is similar to *Aretakis v. Caesars Entm't*, 16 Civ. 8751 (KPF), at \*16-17 (S.D.N.Y. Feb. 23, 2018), where the plaintiff attempted to receive an assignment to the remaining payments of a $1 million prize fee for a golf contest by arguing that the offer to pay a $20 entry fee into the contest constituted sufficient consideration. However, the offer to pay the entry fee was found to be inadequate past consideration because it was already paid before an assignment was ever contemplated.

Further, the dubious "assignment" is unequivocally "champerty", the "medieval" doctrine associated with the commodification of litigation. *Tr. for the Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding Corp.*, 13 N.Y.3d 190, 198 (2009). Champerty statutes are designed to "prevent[] the 'strife, discord and harassment' that would be likely to ensue" from trading in claims for the purpose of bringing suit. *Love Funding Corp.*, 13 N.Y.3d at 199 (quoting *Fairchild Hiller Corp. v. McDonnell Douglas Corp.*, 28 N.Y.2d 325, 329 (1971)). New York has codified the prohibition on champerty in Judiciary Law § 489(1), which "restricts individuals and companies from purchasing or taking an assignment of notes or other securities 'with the intent and for the purpose of bringing an action or proceeding thereon.'" *Justinian Capital SPC v. WestLB AG*, 28 N.Y.3d 160, 166 (2016) (quoting § 489(1)).

The New York Court of Appeals has clarified that the prohibition applies where "the *primary purpose*" of a transaction is "to enable [the purchaser] to bring a suit, and the intent to bring a suit must not be merely incidental and contingent." *Id.* at 166-67 (quoting *Moses v. McDivitt*, 88 N.Y. 62, 65 (1882)). Champertous assignments of rights are frequently seen in the assignments of debt instruments where courts have held an assignment of rights is not champertous

"if its purpose is to collect damages, by means of a lawsuit, for losses on a debt instrument *in which it holds a preexisting proprietary interest*." *Love Funding Corp.*, 13 N.Y.3d at 195 (emphasis added). An example of a champertous assignment is in *Aretakis v. Caesars Entm't*, 16 Civ. 8751 (KPF), at *19-21 (S.D.N.Y. Feb. 23, 2018), where it was "…clear form the face of the document by which he attempt to assign his rights to Plaintiff" for the purpose of "allow[ing] Plaintiff to prosecute this case to obtain a money judgment." *Id.*

Here, the assignment states Progressive is allowing Plaintiffs "to pursue such rights, claims, causes of action, or interests; to maintain actions and do all things in relation to such rights, claims, causes of action, or interest, including the settlement or compromise of same; and to receive any proceeds therefrom…" (Exhibit E). Further, the invalid assignment was "executed" on December 15, 2020 but was "deemed to be effective as of January 1, 2018" for the sole purpose of allowing Plaintiffs to continue their lawsuit that was already pending at the time the assignment was made. The purpose of the assignment is clear; thus, it is champertous and must be held invalid.

### H.     Plaintiffs' Claim for Punitive or Exemplary Damages Should Be Dismissed

"As a general rule, under New York law punitive damages are appropriate in cases involving 'gross, wanton, or willful fraud, or other morally culpable conduct.'" *Wrap-N-Pack, Inc. v. Kaye*, 528 F. Supp. 2d 119, 123-24 (E.D.N.Y. 2007) (citing *Action S.A. v. Marc Rich Co., Inc.*, 951 F.2d 504, 509 (2d Cir. 1991)). Further, "[p]unitive damages…are directed at actual and potential egregious wrongdoers." *Geressy v. Digital Equipment Corp.*, 950 F. Supp. 519, 523 (E.D.N.Y. 1997). The New York Court of Appeals explained that "[w]e have consistently adhered to the view that the purpose of punitive damages is solely to punish the offender and to deter similar conduct on the part of others. Punitive damages are not intended to compensate or reimburse the plaintiff." *Id.* at 523 (citations omitted). Punitive or exemplary damages require a defendant's conduct to "…[amount] to such gross, wanton or willful fraud, dishonest, or malicious wrongdoing

as to involve a high degree of moral culpability, making it appropriate to deter the defendants from engaging in similar conduct in the future and to induce the victim to take action against the wrongdoer." *Greenfield v. Professional Care, Inc.*, 677 F. Supp. 110, 117 (E.D.N.Y. 1987) (citing *Whitney v. Citibank, N.A.*, 782 F.3d 1106, 1118 (2d Cir. 1986)). Thus, "[t]he test is not the number of wrongful acts but whether the conduct is sufficiently willful and egregious to indicate a need for something more than compensatory relief." *Id.* at 117.

This Court has already dismissed Plaintiffs' Count VI alleging fraud as Plaintiffs' allegations "did not give rise to a claim that Tesla committed fraud by failing to affirmatively disclose 'special facts' that were known to Tesla and unknowable by Plaintiffs." (Exhibit A, July 16, 2021 Memorandum and Order re Tesla's Motion to Dismiss Count 6 under FED. R. CIV. P. 12(b)(6), Dkt. 68 at 9). Obviously, Plaintiffs cannot possibly maintain claims for punitive or exemplary damages that requires "malicious", "willful or wanton", "egregious", or "other morally culpable" actions to take place. Plaintiffs' prayer for punitive or exemplary damages must be stricken from the SAC due to the distinct lack of a scintilla of evidence supporting the incredibly high standard needed for a claim for punitive or exemplary damages under New York law.

## CONCLUSION

Tesla requests that this Court grant its Motion for Summary Judgment under FED. R. CIV. P. 56 and: (i) dismiss Plaintiffs' Second Amended Complaint with prejudice; (ii) dismiss Plaintiffs' prayer for punitive, treble, and exemplary damages with prejudice; and (iii) further award Tesla any and all additional relief the Court may deem just and proper.

Respectfully submitted,

BY:  */s/Matthew G. Berard*
BOWMAN AND BROOKE LLP
Thomas P. Branigan, Esq. (*Pro Hac Vice*)
Matthew G. Berard, Esq. (*Pro Hac Vice*)

41000 Woodward Ave., Suite 200E
Bloomfield Hills, Michigan 48304
(248) 201-3300

And

AARONSON RAPPAPORT FEINSTEIN &
DEUTSCH, LLP
600 Third Avenue
New York, New York 10016
(212) 593-6700
Our File No.: 5003.015

Date: July 1, 2022                    *Attorneys for Tesla, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on <u>**July 1, 2022**</u>, I electronically served the foregoing paper to the following via e-mail:

Stephanie E. Niehaus
Michael R. Nelson
Jessica Bradburn Loucks
NELSON LAW, LLC
200 Park Avenue, Ste. 1700
New York, NY 10017
(212) 457-1668 Phone
(646) 766-9945 Fax
stephanie.niehaus@nelson.legal
nelson@nelson.legal
jessica@nelson.legal

*Attorneys for Plaintiffs Wai-Leung Chan and Jing Wang*

**BOWMAN AND BROOKE LLP**

BY: <u>/s/ *Matthew G. Berard*</u>
MATTHEW G. BERARD

*Attorney for Tesla, Inc.*